

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-10-00062-CV

ALLEGIANCE HILLVIEW, L.P.                                         APPELLANT

V.

RANGE TEXAS PRODUCTION,                                  APPELLEES
LLC AND RANGE PRODUCTION
COMPANY

----------

## FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

## I. Introduction

Appellant Allegiance Hillview, L.P. (Allegiance) appeals the trial court's declaratory judgment in favor of Appellees Range Texas Production, LLC and Range Production Company (collectively, Range) concerning the force majeure provision in the Surface Use Agreement (SUA) between Allegiance and non-party Rayzor Investments, Ltd. (Rayzor). After a bench trial, the trial court found that events of force majeure had occurred, and it extended the deadline under the SUA by which Range was required to drill a well. Challenging the legal and

factual sufficiency of the evidence, Allegiance contends in its first three issues that the trial court erred by finding (1) that Range provided timely and sufficient written notice of an event of force majeure, (2) that an event of force majeure beyond Range's reasonable control occurred, and (3) that Range timely submitted its permit applications. In its remaining issues, Allegiance challenges the award of attorney's fees to Range, the trial court's entry of a permanent injunction, and the trial court's failure to make additional findings of fact and conclusions of law requested by Allegiance. We affirm.

## II. Background

Allegiance is the surface owner of two contiguous tracts of land in Denton, Texas (the Property); Rayzor is the mineral interest owner of the Property; and Range is Rayzor's oil and gas lessee. The SUA provided that it would terminate if Range did not commence drilling by July 11, 2009 (the Development Deadline). However, the SUA also provided that the Development Deadline could be extended if Range were prevented from drilling by an event of force majeure, which the SUA defined to include the City of Denton's (the City) failure to issue necessary permits. Range did not acquire the necessary permits before the Development Deadline and initiated this litigation when Allegiance threatened to terminate the SUA.

### A. Original Development Deadline

When Allegiance purchased the Property's surface estate in 2005, all minerals had previously been reserved by Rayzor.

Allegiance and Rayzor entered into the SUA in April 2006.[1] Under the SUA, the parties designated four drill sites (the Reserved Drill Sites) on the Property so that Rayzor could drill and produce minerals, but Rayzor's right to access and use the Reserved Drill Sites originally terminated if it did not commence actual drilling of a well by October 7, 2008. The purpose of the drilling deadline was to allow for drilling activity before Allegiance developed the surface. Before drilling could commence, however, Rayzor or its lessee was required to obtain a Specific Use Permit (SUP) from the City.

In February 2008, Rayzor and Range entered into a mineral lease (the Rayzor lease), under which Range would attempt to drill for and develop the minerals on the Property. Before the parties signed the lease, Range Landman Jody Watkins had advised Rayzor President Doug Elliott that Range would "commence the permitting process with the City" within sixty days of signing the lease, that Range had "been through all of the issues with the City of Denton before, and [that] by default [Range had] become very well versed in their ordinances and policies." Range was also aware before signing the Rayzor lease that Rayzor's prior lessee, Dark Horse, did not timely obtain permits or begin drilling and that the lease with Dark Horse had therefore terminated, and

---

[1]As the current surface owner, Allegiance plans to develop the Property into a mixed-use development known as Rayzor Ranch.

3

Elliott had emphasized to Range the need for the permit in light of the issues surrounding the Dark Horse lease. In fact, Range had concerns before signing the Rayzor lease about whether it could meet the original October 2008 drilling deadline. Even so, Watkins informed Elliott on February 12, 2008, that Range would "diligently pursue the permitting process, together with the SUP and all other necessary permits and requirements as may be required by the City." At the same time, however, Watkins expressly stated to Elliott that Range had "no control over" the permitting process.

In April 2008, Range personnel met with City representatives and discussed the need for and the process of obtaining a SUP. As a result of the meeting, Mary Patton, a regulatory manager for Range, understood and expected that it would take three months from the date of filing the application through the date of the city council meeting to obtain approval of a SUP. Near this same time, Allegiance indicated to Elliott that it would agree to extend the Development Deadline for approximately one year.

## B. Amended Development Deadline

On July 11, 2008, Allegiance and Rayzor executed the First Amendment to Surface Use Agreement. The SUA amendment reduced the number of Reserved Drill Sites from four to one, expanded the force majeure provision to include the City's failure to issue a permit provided the permit application had been timely submitted and thoroughly prosecuted to attempted completion, and extended the Development Deadline to July 11, 2009. Because of its experience

4

with Dark Horse's inability to obtain a gas well permit from the City in 2007, Rayzor wanted to expand the force majeure clause to specifically ensure that it applied to time spent by the City in approving permit applications. Watkins testified that, as of July 2008, he felt that the one-year extension provided Range with enough time to get the permits approved by the City so that drilling could commence before the July 11, 2009 Development Deadline.

## C. Pre-Permit Process

### 1. Leases and Waivers

Watkins testified that, from his perspective as a landman, the permitting process "really begins the day that we start evaluating a prospect" and that it includes evaluating possible drill sites, determining applicable zoning and waiver requirements, coordinating with surveyors to begin preparing surveys and plats, researching to identify and contact any potentially affected adjacent mineral owners, and obtaining necessary mineral leases and set-back waivers from those mineral owners. In this case, the title research revealed outstanding mineral interests affecting a portion of the Property and adjacent tracts. And because the number of Reserved Drill Sites had been reduced from four to one by the SUA amendment, Range had to determine how to drill on the southern portion of the Property while sufficiently accessing the northern portion of the Property. This required a lease from the State of Texas so the wellbores could cross beneath Highway 380 into the northern portion of the Property. Range acquired the State of Texas lease in August 2008.

The Reserved Drill Site reduction also required Range to acquire leases from mineral owners adjacent to the Property because, without leases from the adjacent mineral owners, Range would need a spacing exception from the Texas Railroad Commission for a wellbore to be within specified distances of the outlying tracts. Allegiance owned the mineral interest for a tract on the northwestern side of the Property, Albertson's owned the mineral interest for a tract on the eastern side of the Property, and another entity owned the mineral interest to the north of the Property. Range was not ultimately able to obtain leases for the Albertson's tract to the east or the tract to the north, but Range negotiated with Allegiance for several months and obtained a lease from Allegiance in December 2008. However, Range's title research revealed that a joint venture owned a fifty percent interest in some of Allegiance's adjoining property. The joint venture was in the process of dissolving, and Range obtained curative leases for those mineral interests after several more months.[2]

In addition to mineral leases and given Range's initial plan to drill six wells on the Property, Range was also required to obtain set-back waivers from three nearby homeowners because of the proximity of the Reserved Drill Site to those residences. Range obtained the first waiver in February 2008 and the second waiver in April 2008. These two waivers were sufficient for Range to drill five out

---

[2]Range finalized the curative leases in the summer of 2009, after it had submitted its SUP application to the City. It also applied for a spacing exception from the Texas Railroad Commission after initially submitting plats to the City showing the wellbores "short" of their eventual locations.

of six possible gas wells on the Reserved Drill Site. But Range believed six wells were necessary to fully develop the minerals, and drilling six wells required the third set-back waiver. Range continued to seek the third waiver by contacting and negotiating with the homeowner; Range originally offered $500, the same amount offered to and accepted by one of the other homeowners, and later offered to lease the property for a $4,000 bonus, the same amount paid for the second waiver. Range ultimately offered to lease the property with a bonus payment between $5,000 and $10,000. Watkins testified that Range decided in February 2009 that it would not get the third waiver and that Range then revised its spacing plans to drill five rather than six wells.

### 2. Surveys and Plats

In 2008, and after it signed the Rayzor lease, Range engaged the two surveyors that had previously worked with Dark Horse to survey the Property and prepare the plats necessary to obtain drilling permits from the City and the State of Texas. One surveyor prepared the plats for filing with the City, and the other surveyor prepared the plats for obtaining State permits. Range was able to provide the surveyors with much of the information they needed to prepare the plats, but the surveyors also needed information about the adjoining tracts (and whether they would or would not be leased) before they could determine the exact shape and size of the Property.

Range had acquired most of the information needed by the surveyors by early 2009. In that regard, Patton requested on January 2 that one of the

7

surveyors begin preparing plats to be submitted to the City. Watkins testified that it generally takes a surveyor one to two months to prepare a plat but that it depends on the circumstances. The surveyor that prepared the plat for the City provided a preliminary plat to Patton on January 27, and the second surveyor forwarded the plat for the State permits to Watkins on March 4. Range then filed applications for the necessary permits from the Texas Railroad Commission and the Texas Commission on Environmental Quality, and both were approved by March 13. The state permits were then forwarded to the surveyor preparing the City gas well plat, and the surveyor provided the final plat to Range in late March 2009.

## D. Permit Process

### 1. General Permit Process

To drill on the Property, Range needed the City's approval for three things: (1) a SUP, which is similar to a zoning ordinance; (2) a gas well permit, which is administratively approved by City staff; and (3) a permit from the fire department, which is issued only after the drilling rig is on site and the gas well permit has issued. Before the SUP can be approved by the City Council, the application must be reviewed by the Denton Development Review Committee and the Denton Planning and Zoning Commission. The development review committee provides comments to the applicant within ten days, the applicant addresses the comments, and the development review committee then has another ten days to provide additional comments. Typically, once all comments by the development

review committee have been addressed, the application is scheduled for the next available planning and zoning commission hearing.

The planning and zoning commission meets two times each month in public hearings that require ten days' public notice, and it makes recommendations to the City Council, not final decisions. The planning and zoning commission can hold the SUP application under advisement, table it for a future meeting, recommend approval or denial of the application, or recommend approval of the application provided the applicant meets additional conditions. If not held under advisement or tabled, the application is then scheduled for the next available City Council meeting.

The City Council meets once each month in a public hearing that requires fifteen days' public notice. Once the SUP application is before the City Council, the process and options available to the City Council are similar to those of the planning and zoning commission such as tabling the application, denying the application, or recommending approval provided certain conditions are met. Once an application is approved by the City Council, it generally takes four to five days before the applicant can prepare the site, obtain the final permit from the fire marshal, and actually begin drilling.

## 2. City of Denton Submission Schedule

In January 2009, the City published its schedule of monthly City Council meetings for the year. As relevant here, the schedule showed June 16 as the last City Council meeting date before the Development Deadline.[3] On March 2, 2009, the City published a Planning and Zoning and City Council Submission/Hearing Schedule (the Submission Schedule) to provide developers with a forecast of how long it would take to get a permit application to the City Council for hearing.

City Planning Supervisor Charles Russell testified that the Submission Schedule was not a new rule or regulation but was instead an attempt to accommodate developers by committing to writing its existing policies and practices. Russell testified that the Submission Schedule did not lengthen the permit application and review process, but he also testified that it could take longer for some applications to proceed through the process under the Submission Schedule than it may have taken in the past.[4] Russell acknowledged, however, that the City had hosted a luncheon with surface developers before publishing the Submission Schedule and that mineral developers like Range were not invited to the luncheon.

---

[3]The July City Council meeting occurred on July 21, 2009.

[4]Patton and Watkins referred to the Submission Schedule as "new" in their testimony, and Patton explained that she believed it was new because it showed a four-month SUP process whereas Russell had informed her in April 2008 that the SUP process took "up to three months." Patton further testified that she was told by City staff in April 2009, after the City published the Submission Schedule, that a SUP could be approved in as little as two months if everything was correct when submitted.

As of March 2009, the Submission Schedule was posted in the City's planning office, copies were made available to the public, and a copy was posted on the City's website. According to the Submission Schedule, a permit filed on March 2, 2009, would not reach the City Council for review and approval until at least July 21, 2009. Indeed, Patton sent an e-mail to other Range personnel on March 31 that stated: "Looking at the City permitting schedule, we will be on the agenda for the August 18 City Council meeting – the earliest that we can be approved to build location. Will we be able to extend the 7/10/09 [sic] lease obligation?"

On April 2, Patton e-mailed Elliott to ask for an extension of the Development Deadline. Elliott responded that only Allegiance could grant an extension, that Allegiance would likely "demand more than a pound of flesh to do it," and that he was "utterly appalled" that there was an issue with drilling by the deadline after negotiating in 2008 to "get more than enough time to file for a permit."

### 3. Range Files SUP Application

On April 3, Range filed its gas well plat application with the City, but the filing did not include a SUP application. That same day, Patton sent an internal Range e-mail stating, "[I]t is possible that our application for Gas Well Permit has been accepted and that we will not have to go through the SUP process that requires P&Z and City Council hearings. The SUP process would result in a permit to build no sooner than 8-18-09." Patton further stated that the confusion

11

as to whether a SUP was required had been caused by (1) inconsistent information from Dark Horse's prior application that indicated a SUP was required and "updated information" from Range's surveyor that indicated a SUP was not required; (2) the City's "changed" process "where it takes longer to get SUP approval"; and (3) the City planner handling the application not knowing that the zoning had changed.  Indeed, as of April 2009, the City's website showed the Drill Site as being zoned "RCC-D," which is a "drill by right" classification that does not require a SUP.  However, Russell testified that there was never a time that a SUP was not required, and he said the City's website contains a disclaimer advising applicants to contact the City with any questions.

On April 6, Russell informed Patton by e-mail that the applicable zoning ordinance required Range to file a SUP application.  On April 16, Range filed its SUP application and met with City staff to discuss the SUP application and to ask the City to expedite the review process.  The City agreed to try to expedite the process, and Range and the City hoped to have the SUP application heard at the May 20 planning and zoning commission hearing and presented to the City Council at its June 16 meeting.

### 4. City Review of Range Application

With Range's filing date of April 16, the SUP application would need to be reviewed by the development review committee and the planning and zoning commission and approved by the City Council in two months.  Russell testified that he was "pretty concerned when we had that meeting" on April 16 about

12

getting before the City Council on June 16, stating that it "would be as fast as I think we've ever seen an SUP for a gas well go from start to finish." Even so, Range's SUP application was processed and distributed to the development review committee with a proposed review due date of May 8 and a development review committee meeting date of May 14. Patton e-mailed City staff on April 24 to inquire about any questions City staff may have had.

On April 28, the City asked Range to submit a project narrative to demonstrate how it met the SUP criteria outlined in the Denton Development Code. Range submitted the requested project narrative to the City on April 29, but City staff determined that Range's responses were not sufficient.[5] The City planning department returned the development review committee's comments to Range on May 8 and informed Range that the engineering department had an issue with the proposed driveways on the site plan and that the issue had to be resolved before the public hearing.

For Range's applications to be considered at the May 20 hearing, all development review committee comments had to be addressed by May 12. The driveway access issue was not resolved by that date, and the City informed Range that the SUP application would instead be considered at the June 3 planning and zoning commission hearing. Range met with the development review committee on May 14 to resolve the outstanding comments, and both agreed that Range would have to amend the project site plan and apply for a

[5]Range submitted a revised project narrative on May 13.

13

second driveway permit through the variance process at a later date. Range submitted all recommended revisions to the development review committee on May 21, and the development review committee released the project on May 28.

In the meantime, the City had provided public notice on May 7 that Range's SUP application would be considered at the May 20 planning and zoning commission hearing, even though the development review committee comments had not yet been resolved. The City would not typically send this notice before resolving the development review committee comments, but the City did so to try to expedite the process. Unfortunately, the City's May 7 notice incorrectly listed a RCC-D zoning classification, which does not require a SUP, instead of the correct NRMU zoning classification, which does require a SUP. The City discovered the notification error on May 26, and Range notified Allegiance of the City's notification error on May 29.

Because public notices must be posted ten days prior to a planning and zoning commission hearing, consideration of Range's SUP application had to be postponed to the June 17 planning and zoning commission hearing, meaning the SUP application could not be considered by the City Council until at least July 21, ten days after the Development Deadline. At the June 17 hearing, the planning and zoning commission recommended approval of the SUP application by a vote of four in favor and none opposed.

**E. Range Requests Extension of Development Deadline**

14

On May 20, Range requested that Allegiance agree to a three-month extension of the July 11 Development Deadline. On May 29, Watkins e-mailed Rex Paine with Allegiance asking if there had "been any discussions regarding Range's request for an extension of the Development Deadline." Paine testified that Allegiance knew in early May that it would not grant an extension to Range without getting something in return, and he admitted that he did not respond to Range's request until June 18 when he informed Range that Allegiance did not agree to an extension.

On June 19, Range asked Rayzor president Elliott for help in getting an extension of the Development Deadline from Allegiance. Elliott contacted Allegiance, but he testified that he felt that Range's inability to meet the Development Deadline and need for an extension was "completely the fault of Range" for not timely filing the SUP application and that he would consider suing Range if Rayzor lost its drilling rights. Similarly, Elliott stated in an e-mail to Watkins that he had informed Allegiance of his disappointment with Range but that he had also advised Allegiance that a short delay "would not damage them economically in any significant way and that they were not likely going to be able to avoid wells on the property just by denying this extension."

## F. Force Majeure Notice and Resulting Litigation

On June 29, Range notified Allegiance by letter that it believed an event of force majeure had occurred based on the City's failure to issue the permits. Range's letter stated, in part, that the City "has failed to issue an SUP and Gas

15

Well Permit (the "Permits") as required to drill a gas well at the location as set forth in the Amended SUA." The notice letter then explained that the City had acknowledged making a notification error that required Range's application to be considered at the June 17 planning and zoning commission hearing instead of the June 3 hearing, meaning Range's application could not be considered by the City Council until at least July 21.

On July 8, Allegiance responded to the notice letter by objecting to the requested extension, contesting whether an event of force majeure had occurred, and informing Range that it intended to enforce the Development Deadline. On July 10, one day before the Development Deadline, Range filed this suit seeking a declaration that an event of force majeure had occurred and requesting attorneys' fees and a temporary restraining order and injunction against Allegiance. The trial court granted the temporary restraining order, and the parties subsequently agreed to extend the injunction through the time of trial.

## G. The City's Subsequent SUP Approval

The City Council's first opportunity to consider and vote on Range's SUP application was July 21, 2009. At that meeting, however, the City Council tabled the application and did so again in August, eventually approving Range's SUP application on October 6. The City then approved Range's Gas Well Plat on November 3. Michael Middlebrook, Range's Vice President of Operations for the Barnett Shale testified that if the trial court permitted Range to proceed, there was no further impediment to Range's ability to drill on the Property.

16

## H. Bench Trial

The case proceeded to a bench trial beginning November 9, 2009, and the trial court signed a final judgment for Range on November 25, 2009. In its judgment, the trial court recited that an event of force majeure had occurred, that Range had given proper notice to Allegiance, and that the July 11, 2009 Development Deadline would be extended to the forty-fifth day after the date of the judgment. The trial court also awarded attorney's fees of $210,000 to Range. Allegiance timely requested findings of fact and conclusions of law, and the trial court issued sixty-seven findings of fact and twenty-one conclusions of law. Allegiance then requested that the trial court make additional findings of fact and conclusions of law, but the trial court did not make the requested additional findings. Allegiance then filed notice of this appeal.

## III. Standards of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred

17

by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

18

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## IV.  Applicable Law

"[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure," and reviewing courts "are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended." *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 283 (Tex. App.—Amarillo 1998, pet. denied); *see Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 420 (Tex. App.—Texarkana 2008, pet. denied).  When construing contracts and other written instruments, our primary concern is to ascertain the true intent of the parties as expressed in the instrument. *Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God*, 307 S.W.3d 816, 820 (Tex. App.—Fort Worth 2010, pet. denied); *NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.).  We examine the entire contract in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Wood Care*, 307 S.W.3d at 820; *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229

(Tex. 2003).  "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Dist., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

## V.  Force Majeure

In its first three issues, Allegiance contends that the evidence is legally and factually insufficient to support the trial court's findings (1) that Range timely provided sufficient written notice of an event of force majeure, (2) that an event of force majeure beyond Range's reasonable control occurred, and (3) that Range timely submitted its permit applications.

## A.  Timely and Sufficient Notice

Allegiance argues in its third issue that there is legally and factually insufficient evidence to support the trial court's findings that Range provided timely and sufficient written notice of an event of force majeure.

The SUA provided that a party desiring to extend the Development Deadline due to an event of force majeure was required to give written notification to the other party at least five business days before the Development Deadline.  The SUA further provided that the notice "shall include an explanation of the claimed Force Majeure event and a good faith approximation of the date that such matters shall be resolved, and the corresponding anticipated extension to the Development Deadline."

20

The Development Deadline was July 11, 2009. Range's June 29, 2009 notice letter, in its entirety, stated:

> Pursuant to Section 6 of the First Amendment to Surface Use Agreement ("Amended SUA"), Range Texas Production, LLC ("Range") hereby advises you that an event of Force Majeure as defined under the Surface Use Agreement ("SUA") and the Amended SUA has occurred and will require an extension to the Anticipated Development Deadline as defined in the Amended SUA.
>
> The City of Denton has failed to issue an SUP and Gas Well Permit (the "Permits") as required to drill a gas well at the location as set forth in the Amended SUA. On May 26, 2009, Chuck Russell, AICP, Planning Supervisor, Planning Department of the City of Denton acknowledged that the City of Denton had made a notification error that would require rescheduling of the June 3, 2009 Planning and Zoning hearing, delaying the meeting until June 17, 2009 and causing the earliest City Council meeting that could be scheduled to be July 21, 2009.
>
> Range believes that the City of Denton will issue the Permits at the July 21, 2009 City Council meeting as referenced above.
>
> The anticipated extension to the Development Deadline as defined in the SUA and Amended SUA is 45 days.

Allegiance argues that although the notice letter "makes a reference to the City's failure to issue an SUP and Gas Well Permit, that reference is clearly within the limited context of the City's notification error." Allegiance's argument is, however, based on the incorrect premise that the City's failure to issue the permit and the City's notification error are separate and distinct events of force majeure. Rather, as discussed in more detail below, the City's notification error allegedly prevented the City Council from considering the SUP application by the Development Deadline.

21

The SUA required that Range, at least five business days before the July 11, 2009 Development Deadline, give Allegiance written notice containing an explanation of the claimed event of force majeure, a good faith estimation of the date the event would be resolved, and the corresponding anticipated extension to the Development Deadline. The June 29, 2009 notice letter complies in each respect. It was sent more than five business days before the Development Deadline, stated that the City had failed to issue the SUP and Gas Well Permit, set forth an expected resolution date of July 21, and stated that the anticipated Development Deadline extension would be forty-five days. Range's statement in the letter concerning the City's notification error is the explanation of the City's failure to issue the permits by the Development Deadline and is not, as Allegiance incorrectly contends, a limitation of the claimed event of force majeure or notice of a separate and unrelated event of force majeure.

Applying the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's findings that Range provided timely and sufficient notice to Allegiance of an alleged event of force majeure. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *Pool*, 715 S.W.2d at 635. We overrule Allegiance's third issue.

**B. An Event of Force Majeure Occurred**

22

Allegiance argues in its first issue that the trial court erred by finding that an event of force majeure beyond Range's reasonable control occurred because no event of force majeure occurred as a matter of law and because there is legally and factually insufficient evidence to the support the trial court's finding. In its second issue, Allegiance contends that the trial court incorrectly interpreted the meaning of "timely" in the submission of Range's permit application and alternatively that "timely" is ambiguous, and that there is legally and factually insufficient evidence to support the trial court's finding that Range timely submitted its permit applications. Because Allegiance's first and second issues are closely related, we consider them together.

## 1. Relevant Contractual Provisions

As amended, the SUA provided that the Development Deadline was July 11, 2009. As relevant in this appeal, Range's right to drill on the Property terminated if it did not drill by the July 11, 2009 Development Deadline unless the deadline was extended by an event of force majeure. As amended and as relevant to Allegiance's first and second issues, the force majeure provision in the SUA stated:

> "Force Majeure" as used herein shall mean . . . the City of Denton's (or other governmental authority's) failure to issue permits (provided that the Permit Seeker has timely submitted permit applications and thoroughly prosecuted such applications to attempted completion) . . . so long as such event is beyond the reasonable control of the Party claiming the benefit of such Force Majeure and only in the event such Party is taking all reasonable action to remedy such Force Majeure.

## 2. The City Failed to Issue Permits

23

Allegiance contends that the trial court erred by finding that an event of force majeure occurred because the City did not fail to issue the permit by the deadline. In other words, Allegiance argues that before the City could be found to have failed to issue the permit, the City necessarily must have had an opportunity before the July 11 Development Deadline to "consider and vote on the permit application in time for Range to meet its deadline." But the SUA did not require that the City have an opportunity to consider and vote on the permit application before it could be found to have failed to issue permits.

The SUA defined an event of force majeure to include "the City of Denton's . . . failure to issue permits" so long as (1) Range timely submitted and thoroughly prosecuted the permit application to completion, (2) the City's failure to issue the permit was beyond Range's reasonable control, and (3) Range took "all reasonable action" to remedy the City's failure to issue the permit. Thus, the City's failure to issue permits could qualify as an event of force majeure under the SUA if these three conditions were met. But Allegiance's argument would add a fourth condition requiring the City to have an opportunity to consider and vote on the application before the Development Deadline. Because we are not permitted to rewrite the SUA, we reject Allegiance's contention that an event of force majeure did not, as a matter of law, occur because the City did not have an opportunity before the Development Deadline to consider and vote on Range's permit application. *See, e.g., Sun Operating Ltd.*, 984 S.W.2d at 283 (stating that

24

an appellate court is "not at liberty to rewrite the contract or interpret it in a manner which the parties never intended").

Allegiance also argues that the City's notification error is not a qualifying event of force majeure because the City's error did not cause Range's application to be delayed beyond the Development Deadline. Specifically, Allegiance argues that Range's failure to address the driveway access issue by May 12 caused the planning and zoning commission hearing to be rescheduled for June 3 and that there was not sufficient time by June 3 to provide fifteen days' public notice before the June 16 City Council meeting, the last meeting before the Development Deadline. Range responds that the City would have considered the SUP application by the Development Deadline but for the City's notification error.

Allegiance attempts to separate and individually challenge the City's failure to issue permits and the City's notification error as separate events of force majeure. Rather, the City's notification error caused the City Council to not have the opportunity to consider the SUP application before the Development Deadline, and legally and factually sufficient evidence supports the trial court's finding that the City failed to issue the permits.

Range filed its application for a Gas Well Permit on April 3, 2009. Russell, the City planning supervisor, testified that the City's website showed at that time that the drill site was zoned RCC-D, which did not require a SUP. The City notified Range on April 6 that the applicable zoning ordinance did require a SUP,

25

and Range filed its SUP application on April 16. Also on April 16, Range met with City officials and requested expedited review of the SUP application, and the City agreed to get the application through the process as quickly as possible. To accomplish this, the City sent public notice of the May 20 planning and zoning commission hearing on May 7, even though the City would typically have waited to issue the notice after all comments by the development review committee were resolved. The SUP application was tabled from the May 20 to the June 3 planning and zoning commission hearing because the development review committee comments were not resolved, but no new additional public notice was required. Range submitted a revised site plan on May 21, and the development review committee released the project on May 28. Moreover, Russell testified that the City could have sent a notice for the June 16 City Council meeting in advance of the planning and zoning commission hearing and that the City has given similar notices "from time to time" in the past. In the interim, however, Russell discovered on May 26 that the May 7 notice mistakenly listed a zoning code of RCC-D instead of NRMU, and this required a new public notice before the planning and zoning commission could consider Range's SUP application. Russell testified that the notification error caused Range's SUP application to be delayed from the June 3 to the June 17 planning and zoning commission hearing and that but for the notification error, the SUP application could have been considered by the City Council on June 16.

Allegiance also argues the evidence is insufficient because Range believed on May 20 (six days before learning of the City's notification error) that it could not meet the July 11 Development Deadline. We disagree, however, because the evidence reflects that but for the notification error, the SUP application would have been considered at the June 3 planning and zoning commission hearing and that the City could have timely given public notice (prior to the June 3 planning and zoning commission hearing) that the SUP application would be considered at the June 16 City Council meeting. Thus, despite Range's belief on May 20 that it could not meet the July 11 Development Deadline, other evidence reflects that meeting the deadline was still possible.

### 3. Range Timely Submitted Permit Applications

Allegiance argues that the trial court incorrectly interpreted the meaning of "timely," alternatively that "timely" is ambiguous, and that there is legally and factually insufficient evidence to support the trial court's finding that Range timely submitted its permit applications.

### (a) Trial Court's Interpretation of "Timely"

The trial court interpreted "timely" to mean that the permit applications had to be submitted "within a reasonable time considering all the circumstances." Allegiance contends the trial court's interpretation is erroneous because "timely" must be construed "in the context of an agree[d]-to hard and fast drilling deadline, which, if not met, would cause the 'immediate' termination of Rayzor's and Range's right to drill at all." *See generally Sun Operating Ltd.*, 984 S.W.2d

at 281 (holding that oil and gas lease required production to resume within sixty days of cessation rather than within a reasonable time because the lease provided that it terminated if production ceased for more than sixty consecutive days). Allegiance's argument is misplaced, however, because it attempts to imply a set permit application deadline into the SUA even though the SUA did not contain any such deadline. The SUA clearly included the July 11 Development Deadline by which Range was required to commence actual drilling, but the SUA did not state that time was of the essence nor set forth a deadline by which Range was required to submit its permit applications. Instead, the SUA stated that the City's failure to issue permits qualified as an event of force majeure "provided that [Range] timely submitted permit applications and thoroughly prosecuted such applications to attempted completion."

"[W]here no time for performance is stated in a contract, the law will imply a reasonable time." *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.) (citing *Moore v. Dilworth*, 142 Tex. 538, 542, 179 S.W.2d 940, 942 (1944); *Fitzsimmons v. Anthony*, 716 S.W.2d 719, 720 (Tex. App.—Corpus Christi 1986, no writ)). Reasonableness is determined by the facts and circumstances of the case. *CherCo Props., Inc.*, 985 S.W.2d at 266 (citing *Solomon v. Greenblatt*, 812 S.W.2d 7, 15 (Tex. App.—Dallas 1991, no writ); *Heritage Res., Inc. v. Anschutz Corp.*, 689 S.W.2d 952, 955 (Tex. App.—El Paso 1985, writ ref'd n.r.e.)). Because the force majeure provision did not define "timely" or set forth a date by which the permit

28

applications had to be filed, the law implies that Range was required to file the permit applications within a reasonable time based on the facts and circumstances of the case.[6] *See CherCo Props., Inc.*, 985 S.W.2d at 266. Therefore, the trial court did not err by interpreting "timely" as "within a reasonable time considering all the circumstances," nor is "timely" ambiguous. *See id.*

### (b) Timeliness of Range's Permit Applications

Allegiance also argues there is legally and factually insufficient evidence that Range timely submitted its permit applications. In doing so, Allegiance points to evidence that Range believed when it signed the Rayzor lease in February 2008 that eight months would be sufficient time to perform all tasks necessary to drill by the original October 2008 drilling deadline; that once the SUA was amended in July 2008, Range had a full year to begin drilling; that Range had two set-back waivers by April 2008, the same number it had when it decided in February 2009 to proceed without the third set-back waiver; that

---

[6]Allegiance contends that the trial court should have interpreted "timely" to mean "the submission of permit applications to the City by a date which, in the usual and ordinary course of business, would result in the issuance of all necessary permits in time for Range to commence drilling by July 11." But Allegiance has not provided any authority approving of its proposed interpretation. Further, the trial court interpreted "timely" to mean "within a reasonable time considering all the circumstances," and this interpretation necessarily includes what would be done in the usual and ordinary course of business. The trial court's interpretation also necessarily allowed for consideration of the City's Submission Schedule, the apparent flexibility within that Submission Schedule, the City's attempts to try to expedite the application process, and the possibility of approval but for the City's notification error.

Range was aware it could face opposition from the community at public hearings; and that once Range's SUP application was approved in October 2009, it took Range almost another month to obtain a gas well plat.  Allegiance also points to evidence that Range expected the SUP process to take at least three months; that despite this knowledge, Range did not file the SUP application until April 16, two months before the June 16 City Council meeting; that Range knew by the end of March that it would have trouble meeting the Development Deadline; and that Range had to ask the City to expedite its application once it had been filed.

While Allegiance's arguments are supported by the record, there is also other evidence supporting the trial court's findings that Range submitted its permit application within a reasonable time under the circumstances.  The evidence in the record shows that an operator such as Range must evaluate and decide on drill sites; determine the applicable zoning and waiver requirements; work with surveyors to prepare the necessary surveys and plats; identify, contact, and obtain leases from nearby mineral interest owners; identify, contact, and obtain set-back waivers from nearby homeowners within a certain distance; and prepare, file, and prosecute the permits to completion.  The complexity of each of these tasks depends on the circumstances in each case.

The July 2008 amendment to the SUA reduced the number of drill sites from four to one, meaning Range could only drill on the southern portion of the Property while attempting to sufficiently access the minerals on the northern portion of the Property.  This required that Range obtain leases from the State of

Texas to cross Highway 380 and from other adjacent mineral owners to avoid the need for a spacing exception from the Texas Railroad Commission. Range began negotiating these leases by at least August 2008.

In order to drill the six wells on the Property that Range believed necessary to fully develop the minerals, Range was also required to obtain set-back waivers from three homeowners. Range acquired the first two waivers by April 2008, and Allegiance contends that Range knew by August 2008 that it would not be able to obtain the third waiver. However, the record includes evidence that Range continued negotiations beyond that time. As of September 2008, the third homeowner wanted Range to make its best offer without further negotiation; Range, by November 2008, had made an offer of $4,000 to the homeowner, and Range ultimately offered to lease the homeowner's property for between $5,000 and $10,000. The homeowner refused, and Range decided in February 2009 that it had to proceed with only two set-back waivers and drill five wells on the Property instead of six.

In the meantime, Patton had requested on January 2, 2009, that the surveyors begin preparing the plats for submission to the City. In addition, Range submitted applications to and received permits from the Texas Railroad Commission and the Texas Commission on Environmental Quality in March 2009, and the surveyor finalized the final plat for submission to the City in late March 2009.

31

Range then filed its application for a Gas Well Plat on April 3, three months before the Development Deadline. Although Range had believed all along that a SUP would also be required, both the City's website and Range's surveyor had recently indicated that a SUP was not required, and the City planner that accepted Range's Gas Well Plat application told Patton on April 3 that it was at least possible that Range would not have to go through the SUP process. But on April 6, the City informed Range that a SUP was in fact required, and Range submitted its SUP application ten days later. When it filed its SUP application, Range met with City officials and requested that the City expedite the SUP process, and the City agreed. As of April 16, the plan was to have the SUP application before the planning and zoning commission on May 20 and before the City Council on June 16. Thereafter, and as discussed above, Range's SUP application was ultimately postponed to the June 17 planning and zoning commission hearing and the July 21 City Council meeting because of the zoning classification error in the City's May 7 public notice.

Relying heavily on the fact that Range had acquired the second set-back waiver in April 2008 and could have proceeded with five wells instead of six, Allegiance argues that Range could have filed its permit applications in sufficient time to obtain approval by the Development Deadline but instead made a "conscious and informed business decision to delay filing its applications in order to try to increase its profits." However, Range had a duty to act as a reasonably prudent operator under the same or similar circumstances and to reasonably

32

develop the premises. *See Grayson v. Crescendo Res., L.P.*, 104 S.W.3d 736, 739 (Tex. App.—Amarillo 2003, pet. denied) (citing *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981); *Clifton v. Koontz*, 325 S.W.2d 684, 693 (Tex. 1959)). And there is evidence that Range believed six wells (and thus the third set-back waiver) were necessary to fully develop the Property and that Range decided in February 2009, five months before the Development Deadline, to proceed with five wells instead of six after the third homeowner rejected an offer well in excess of what had been accepted by the other two homeowners.

Finally, Allegiance argues that "a slew of hypothetical and improbable events would have had to take place" for Range to meet the July 11 Development Deadline given its April 16 SUP application filing date. But Allegiance's argument is based on a strict application of the City's submission schedule—which was first published in March 2009, and is a guideline rather than a rule of law—and ignores the City's agreement to expedite Range's SUP application, the City's advance public notice (contrary to its normal practice) of action on Range's application, and the possibility—but for the City's May 7 notification error—that the City Council could have considered the SUP application on June 16, almost a month before the Development Deadline.

The facts of this case present a close call. There is, as Allegiance aptly points out, evidence that Range may have waited too long to submit its SUP application. But there is also evidence that Range acted reasonably under the circumstances to obtain the necessary leases and set-back waivers, prepare the

33

surveys and plats, comply with its obligations to act as a prudent operator to fully develop the minerals, and file the permit application in time to drill by the Development Deadline. As the trier of fact, the trial court determines the credibility of the witnesses and the weight to be given their testimony, and we may not substitute our judgment for that of the fact finder simply because we might disagree with the fact finder's conclusions. *Pool*, 715 S.W.2d at 635; *see In re Doe 4*, 19 S.W.3d 322, 325 (Tex. 2000). With these principles in mind, considering the evidence favorable to the trial court's findings if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not, we hold that legally sufficient evidence supports the trial court's findings that Range timely filed its permit applications. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827. In addition, after considering and weighing all of the evidence in the record pertinent to the trial court's findings, we hold that the credible evidence supporting the finding is not so weak or contrary to the overwhelming weight of all the evidence that the trial court's findings should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823. Thus, we overrule Allegiance's first and second issues.[7]

---

[7]In light of our holdings above, we need not address whether other events such as the filing of this lawsuit, the City's submission schedule, or lack of cooperation by third parties also constituted events of force majeure or whether Range provided timely notice of those events. *See* Tex. R. App. P. 47.1.

## VI. Permanent Injunction and Attorney's Fees

Allegiance argues in its fourth issue that the trial court erred by issuing a permanent injunction against it and awarding attorney's fees to Range and that Allegiance is entitled to its attorney's fees because no event of force majeure occurred. As discussed above, however, we have held that legally and factually sufficient evidence supports the trial court's findings that an event of force majeure occurred, that Range timely submitted its permit applications, and that Range provided timely and sufficient notice to Allegiance of the event of force majeure. Thus, the trial court did not err by issuing a permanent injunction or by awarding attorney's fees to Range.[8] We therefore overrule Allegiance's fourth issue.

## VII. Additional Findings of Fact and Conclusions of Law

In its final issue,[9] Allegiance argues that "this Court cannot ascertain which events the trial court relied upon" because "the trial court did not specify [in its findings of fact and conclusions of law] which alleged event(s) constituted events of force majeure as defined in the SUA." Citing the criminal case of *State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006), Allegiance contends that

---

[8]Allegiance's only challenge to the permanent injunction and award of attorney's fees is that the trial court erred by finding that an event of force majeure occurred. Allegiance does not contend, for example, that the permanent injunction is overly broad or that the attorney's fees awarded are not reasonable and necessary.

[9]Allegiance does not specifically list this argument as a separate issue but does raise it in the alternative to its other four issues.

the trial court's failure to grant Allegiance's request for additional findings of fact and conclusions of law "prevented Allegiance from properly presenting its arguments on appeal." However, Allegiance does not identify which requested but refused additional finding prevented it from properly presenting its appellate argument, nor does Allegiance explain how the trial court's refusal to make the additional finding prevented Allegiance from presenting its appellate argument.

An appellate brief must contain argument and the authorities and facts relied upon for the appeal with references to the pages in the record where those facts can be found. *Weaver v. Sw. Nat'l Bank*, 813 S.W.2d 481, 482 (Tex. 1991); *see also* Tex. R. App. P. 38.1(f), (i). An inadequately briefed issue may be waived on appeal. *Hall v. Stephenson*, 919 S.W.2d 454, 467 (Tex. App.—Fort Worth 1996, writ denied); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing the "long-standing rule" that a point may be waived due to inadequate briefing). Because Allegiance's final issue does not contain appropriate argument or citations to the record, we overrule it as inadequately briefed.

## VIII. Conclusion

Having overruled each of Allegiance's issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED: July 28, 2011

36