

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00351-CV

CAPITOL WIRELESS, LP AND                                         APPELLANTS
EYESIGHT MANAGEMENT, LLC

V.

XTO ENERGY, INC.                                                  APPELLEE

----------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 236-252199-11

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellants Capitol Wireless, LP and Eyesight Management, LLC appeal from a summary judgment granted in favor of Appellee XTO Energy, Inc. on its claim for breach of contract. We will affirm.[2]

---

[1]See Tex. R. App. P. 47.4.

[2]This cause was assigned for writing to the author on January 31, 2014.

## II. Background

XTO pooled oil and gas leases that it owns in McKenzie County, North Dakota, with oil and gas leases that Capitol Wireless owns in McKenzie County to form a 1,280-acre drilling unit. According to XTO, it owns a 56.89585% working interest in the drilling unit, Capitol Wireless owns a 12.5% working interest in the unit, and a number of other individuals or entities own lesser working interests in the unit.

On December 2, 2009, Jacob Higgins, an XTO landman, sent a letter to Capitol Wireless and the other working-interest owners stating that XTO, as operator, proposed to drill, complete, and equip a single, horizontal well—called the Edward 21X-28 (the test well)—on the leased land in McKenzie County to test the Bakken formation. The letter provided details about the test well, stated that a "proposed Joint Operating Agreement will be forthcoming," and gave Capitol Wireless thirty days from receipt of the letter "to make a participation election," which included the following two options:

> ___ **ELECT TO PARTICIPATE** in the proposed drilling and completion of the Edward 21X-28 limited to the working interest of the undersigned party.

> ___ **ELECT TO NOT PARTICIPATE** in the proposed drilling and completion of the Edward 21X-28 as to the working interest of the undersigned party, subject to risk penalty as provided by North Dakota law.

Along with the letter, Higgins included a list of the working-interest owners and their respective working interests; a detailed drilling cost estimate for the

anticipated drilling and completion costs; an authorization for expenditure (AFE) in the total amount of $5,334,000; a drilling plan; and a well location plat.[3]

Three weeks later, on December 23, 2009, Capitol Wireless agreed to participate in XTO's drilling and completion of the test well, limited to its working interest:  Capitol Wireless (by Eyesight Management, Capitol Wireless's general partner) placed an "X" in the space next to the "**ELECT TO PARTICIPATE**" option in the letter; it completed the spaces provided for "Name," "Title," "Signature," "Date," and "Company" in the letter; it completed the "Non Operator Approval" box on the AFE; and it initialed and dated each document that Higgins had sent it.  David Shanks, Eyesight Management's manager, faxed the signed documents to Higgins on December 23, 2009, and sent Higgins an email the next day that stated in part,

> This email is to confirm the election of Capitol Wireless LP to participate in the proposed drilling and completion of the Edward 21X-28 well . . . .
>
> Please contact me at your convenience regarding next steps on the participation.

According to Higgins, Shanks also called him and confirmed Capitol Wireless's election to participate in the test well.

---

[3]Like XTO, we will collectively refer to all of the documents that XTO sent to Capitol Wireless on December 2, 2009, as the Participation Agreement.  *See Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (reasoning that courts may construe instruments pertaining to the same transaction as if they were part of a single, unified instrument).

3

After obtaining Capitol Wireless's agreement to participate in the test well, XTO drilled and completed the well as a producing well. According to Higgins's affidavit, Capitol Wireless's 12.5% share of the joint interest billings for the test well (after an offset) totaled $622,373.65. On December 15, 2010, XTO made a written demand upon Capitol Wireless to pay its proportionate share of the costs incurred by XTO in drilling and completing the test well, but Capitol Wireless did not pay. XTO sued Capitol Wireless and Eyesight Management for breach of contract, alleging that by agreeing to participate in XTO's test well, limited to its working interest, Appellants had entered into an enforceable agreement with XTO to pay 12.5% of the estimated drilling and completion costs for the test well. The trial court granted XTO summary judgment and later signed a final judgment against Appellants jointly and severally, awarding XTO damages in the amount of $622,373.65.

## III. STANDARD OF REVIEW

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A plaintiff is entitled to

4

summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

## IV. BREACH OF CONTRACT

### A. Material Terms and Definiteness

Appellants argue in their first issue that the trial court erred by granting XTO summary judgment because the Participation Agreement is merely an agreement to agree in the future that is indefinite and leaves material terms open for future negotiation.

The elements of an enforceable contract are (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) a communication that each party consented to the terms of the contract; (5) execution and delivery of the contract with an intent that it become mutual and binding on both parties; and (6) consideration. *G.D. Holdings, Inc. v. H.D.H. Land & Timber, L.P.*, 407 S.W.3d 856, 861 (Tex. App.—Tyler 2013, no pet.). For an enforceable contract to exist, the legal obligations and liabilities of the parties must be sufficiently definite. *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.). "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain." *Fort Worth ISD*, 22 S.W.3d at 846. Contract terms are reasonably certain "if they provide a basis for determining the existence of a breach and for

5

giving an appropriate remedy." Restatement (Second) of Contracts § 33(2) (1981). Thus, a contract is sufficiently definite if a court is able to determine the respective legal obligations of the parties. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Whether an agreement fails for indefiniteness is a question of law to be determined by the court. *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied).

When XTO sent the Participation Agreement to Capitol Wireless, XTO, as operator, extended an offer to Capitol Wireless to participate in the drilling and completion of the test well, limited to its working interest, i.e., to pay its pro-rata share, or 12.5%, of the estimated drilling and completion costs of the test well. The underlying offer was clear and unambiguous—Capitol Wireless could either participate and pay its share of the costs, or not participate and potentially be subject to a risk penalty under North Dakota law. The Participation Agreement also outlined data about the test well, including its location and depth; the numerous costs associated with the test well; and each of the working-interest owners and the amount of their respective working interests. By executing and returning to Higgins both a copy of the letter and a copy of the AFE within thirty days of receiving the documents, Capitol Wireless timely accepted XTO's offer in strict compliance with the terms of the Participation Agreement.

Appellants argue that the Participation Agreement does not contain material terms setting out what, if any, expenses Capitol Wireless is responsible for paying and what expenses XTO may charge. The drilling cost estimate

6

actually does just that—it identifies twenty-three different intangible drilling costs, fourteen different intangible completion costs, five different tangible drilling costs, and ten different tangible completion costs, and each individual category of anticipated costs contains a code and a description of the expense.

Appellants argue that the Participation Agreement is unenforceable because it does not state when payments must be made to XTO, but it is well established that when an agreement does not specify a time for performance, a reasonable time for performance is implied in the contract. *Allegiance Hillview, L.P. v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 869 (Tex. App.—Fort Worth 2011, no pet.). Thus, the law implies that Capitol Wireless had to pay XTO its share of the costs within a reasonable time.

Appellants also argue that the Participation Agreement is indefinite as to its percentage interest in the test well, and therefore unenforceable, because the percentages were expressly acknowledged to be subject to future agreement in division orders.[4] However, as XTO explains, the "subject to" language merely indicates that the working interest percentages were based on an initial title opinion and that they could be adjusted, if necessary, once the title opinion was updated. Capitol Wireless's working-interest figure is reasonably certain. *Cf. Nabors Drilling USA, LP v. Carpenter*, 198 S.W.3d 240, 248–49 (Tex. App.—San

---

[4]The document identifying the working interest owners states, "***Based on initial title opinion – subject to final division order title opinion[.]"

Antonio 2006, no pet.) (holding that arbitration agreement was enforceable even though it allowed employer to amend agreement).

Appellants complain that the Participation Agreement is unenforceable because it does not set out how expenses are to be accounted for and disclosed. When an essential term is left open for future negotiation, there is no binding contract. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221. One appellate court has defined "essential terms" as those terms that the parties would reasonably regard as vitally important elements of their bargain. *Gen. Metal Fabricating Corp. v. Stergiou*, No. 01-11-00460-CV, 2014 WL 2363027, at *4 (Tex. App.—Houston [1st Dist.] May 29, 2014, no pet.).

Capitol Wireless did not challenge any aspect of the many invoices that XTO included in its summary judgment evidence, including the method by which the figures were calculated or the figures themselves, nor do Appellants direct us to any authority reasoning that essential terms of an agreement to drill and complete a test well, like the Participation Agreement in this case, necessarily include how expenses are to be accounted. The Participation Agreement contains terms setting forth the total estimated costs for drilling and completing the test well and the percentage of those costs that the working-interest owners are responsible for paying, thus permitting a working-interest owner like Capitol Wireless to calculate its estimated share of the total AFE costs. With a working interest of 12.5%, Capitol Wireless's total estimated cost was $666,750. As it turns out, Capitol Wireless's share of the actual costs (pre-setoff) ended up being

8

$673,123.91, only a little over $6,000 more than the estimated costs. Considering all of this, we cannot conclude that the Participation Agreement is unenforceable for not containing an accounting term.[5] *See Stergiou*, 2014 WL 2363027, at *4; *Crisp Analytical Lab, L.L.C., v. Jakalam Props., Ltd.*, 422 S.W.3d 85, 89–90 (Tex. App.—Dallas 2014, pet. denied) (stating that essential terms of a contract may include time for performance, price to be paid, work to be done, service to be rendered, or property to be transferred and holding that determining reasonableness of expenses was not an essential term of contract).

Appellants contend that the Participation Agreement left material terms open for future negotiation because it states that a "proposed Joint Operating Agreement will be forthcoming," and there is no evidence of a joint operating agreement setting forth the respective responsibilities of the parties. Whether or not a joint operating agreement is often used in these circumstances, and despite the "forthcoming" language, the Participation Agreement contains all of the material terms and is sufficiently definite to constitute a binding contract to drill and complete the test well. We overrule Appellants' first issue.

---

[5]As a non-essential term, the parties could have addressed how expenses are to be accounted for in a later negotiation. *See Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972) ("[P]arties may agree upon some of the terms of a contract, and understand them to be an agreement, and yet leave other portions of an agreement to be made later."). Indeed, the Participation Agreement indicates that "[a] proposed Joint Operating Agreement will be forthcoming."

## B.    Joint Operating Agreement

Directing us to *Foreca, S.A. v. GRD Development Co.*, 758 S.W.2d 744 (Tex. 1988), Appellants argue in their second issue that a fact issue exists regarding whether there was a meeting of the minds on the essential terms of the Participation Agreement because it states that a "proposed Joint Operating Agreement will be forthcoming."  Relying on the same contractual language, Appellants argue in their third issue that the Participation Agreement is ambiguous as to whether it was intended to be a final and binding agreement.

In *Foreca*, GRD sought to purchase and Foreca sought to sell amusement park rides.  *Id.* at 744.  Foreca's president prepared a handwritten document that set out the cost of six rides, the terms of payment, and delivery information.  *Id.* at 744–45.  The document also contained the following provision:  "SUBJECT TO LEGAL DOCUMENTATION CONTRACT TO BE DRAFTED BY MR. DUNLAP [Foreca's Texas lawyer]."  *Id.*  GRD later ended the negotiations, and Foreca sued GRD for breach of contract—specifically, the document that had been prepared.  *Id.*  A jury found for Foreca and awarded it damages, but the court of appeals reversed, concluding that a condition precedent to formation of a contract—the "subject to legal documentation" language—had not been met.  *Id.* at 744.  The supreme court reversed the court of appeals and affirmed the judgment of the trial court, holding that it was a fact question whether the writing was intended to be the final expression of the parties or merely part of preliminary negotiations with no legal significance.  *Id.* at 746.

10

*Foreca* is inapposite because the Participation Agreement in this case contains no language subjecting it to anything. The joint-operating-agreement provision merely references another document, and it does not qualify the finality or enforceability of the Participation Agreement in any way. *See Hardman v. Dault*, 2 S.W.3d 378, 380–81 (Tex. App.—San Antonio 1999, no pet.) (pointing to lack of "subject to" language and holding that settlement agreement was binding despite noncompliance with provision requiring final documents to be signed by a certain date). For the same reason, the provision does not render the Participation Agreement ambiguous. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (reasoning that if a contract is worded in such a way that it can be given a definite or certain legal meaning, then it is not ambiguous.). We overrule Appellants' second and third issues.

## V. OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Appellants argue in their fourth issue that the trial court abused its discretion by denying their objections to XTO's summary judgment evidence. Appellants did not obtain an express ruling by the trial court on their objections. Nonetheless, this court follows the line of authority that a trial court may implicitly rule on a party's objections to summary judgment evidence. *Compare Frazier v. Yu*, 987 S.W.2d 607, 609–10 (Tex. App.—Fort Worth 1999, pet. denied) (observing that amended rule of appellate procedure 33.1 relaxes the former requirement of an express ruling and codifies caselaw that recognized implied

11

rulings), *with Atl. Shippers of Tex., Inc. v. Jefferson Cnty.*, 363 S.W.3d 276, 284 (Tex. App.—Beaumont 2012, no pet. h.) (holding that a party must obtain an express ruling on its objections to summary judgment evidence). However, to preserve error in the trial court's ruling, there must be something in the record reflecting that the trial court ruled on the objections—merely granting or denying the summary judgment is, in and of itself, insufficient. *Aerobic Maint. & Serv., Inc. v. First United Bank & Trust Co.*, No. 02-08-00232-CV, 2009 WL 1425179, at *5 (Tex. App.—Fort Worth May 21, 2009, no pet.) (mem. op.); *see Trinh v. Campero*, 372 S.W.3d 741, 744–45 (Tex. App.—El Paso 2012, no pet.). There is nothing in the record here to indicate that the trial court ruled on Appellants' objections. Consequently, Appellants failed to preserve for appellate review the portions of this issue that implicate their non-substantive objections.[6]

As alluded to, substantive defects in summary judgment evidence may be raised for the first time on appeal. *See Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 498 (Tex. App.—Fort Worth 2002, no pet.). An affidavit that is conclusory is substantively defective. *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 883 (Tex. App.—Dallas 2007, no pet.). Appellants objected that the following portions of Higgins's affidavit were legally or factually conclusory:

---

[6]These include Appellants' objections based on the best evidence rule. *See Lagou v. U.S. Bank Nat'l Ass'n*, No. 01-13-00311-CV, 2013 WL 6415490, at *4 (Tex. App.—Houston [1st Dist.] Dec. 5, 2013, no pet.) (mem. op.).

12

(a) "In connection, I am responsible for pursuing the collection of outstanding debts owed by [Capitol Wireless] for the drilling and completion of the Edward 21X-28 well in McKenzie County, North Dakota."

(b) "Capitol owns 12.5% of the working interest in the drilling unit."

(c) "Specifically, on December 2, 2009, XTO extended a written offer to Capitol to participate in the drilling and completion of the Edward 21X-28 well."

(d) "On or about December 23, 2009, Capitol signed and returned the participation letter to XTO acknowledging that it had decided to participate in the proposed drilling and completion of the Edward 21X-28 well, limited to its 12.5% working interest."

(e) "Subsequently, after obtaining Capitol's agreement to participate and to bear its proportionate share of the drilling and completion costs, XTO drilled and completed the Edward 21X-28 well as a producing well."

(f) "Mr. Shanks made it clear to me that Capitol wanted to participate in the drilling and completion of the Edward 21X-28 well as to its 12.5% working interest."

(g) "Mr. Shanks also confirmed Capitol's election to participate by calling me on the telephone."

(h) "Attached hereto as Exhibit 3 is a true and correct copy of the Account Summary for Capitol on the Edward 21X-28 well, which evidences the amounts owed by Capitol and all credits applied to the account."

(i) "Capitol's 12.5% share of the joint interest billings for the Edward 21X-28 well total $673,123.91."

(j) "XTO setoff Capitol's account and applied $50,750.26 in revenue owed to Capitol to the outstanding balance."

(k) "As of today, and after all offsets, credits and payments, $622,373.65 remains due and owing on Capitol's account."

Appellants' objections to statements (a), (b), (c), (d), (e), (g), (h), (i), (j), and (k) are substantiated by other unobjected-to summary judgment evidence and are

13

therefore harmless, *see* Tex. R. App. P. 44.1(a)(1), and statement (f) is not conclusory. We overrule Appellants' fourth issue.

## VI. EYESIGHT MANAGEMENT

Appellants argue in their fifth issue that the summary judgment should have been denied as to Eyesight Management because summary judgment should have been denied as to Capitol Wireless. Because summary judgment was proper against Capitol Wireless, as we hold, summary judgment was also proper against Eyesight Management, Capitol Wireless's general partner. We overrule Appellants' fifth issue.

## VII. CONCLUSION

Having overruled Appellants' five issues, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

GABRIEL, J., concurs without opinion.

DELIVERED: July 24, 2014

14