

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00003-CV

LESLIE BURTON                                                    APPELLANT

V.

CARTER BLOODCARE,                                          APPELLEES
EMPLOYMENT PRACTICES
SOLUTIONS, INC., AND SUSAN
SORRELLS

----------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Leslie Burton appeals the trial court's final summary judgment, which the court rendered in favor of appellees Carter BloodCare, Employment Practices Solutions, Inc. (EPS), and Susan Sorrells. Appellant contends in five issues that the trial court erred by granting summary judgment against her claims

---

[1]*See* Tex. R. App. P. 47.4.

for age discrimination, false imprisonment, intentional infliction of emotional distress, breach of contract, and defamation. We affirm.

**Background Facts**

In August 2002, when appellant was over fifty years old, Carter BloodCare, a not-for-profit blood center, hired her to be the director of donor collections.[2] Appellant directed fixed-site collections, mobile collections, staff scheduling, and mobile staging (preparing supplies and equipment for mobile blood drives). Three managers—JoEllen Wallis, Brandye Norman, and Carla Buckendorf— reported directly to appellant, and appellant reported to Joe Ridley, who was a senior director. Other employees reported to the managers who were under appellant's supervision, so appellant had many direct and indirect subordinates. In 2003, in addition to her full-time duties associated with being the director of donor collections, appellant also began to supervise Carter BloodCare's collection training department (which Ridley had previously overseen), so she gained more employees who reported directly to her. Appellant was reluctant to supervise the collection training department, but she received a pay raise for doing so.

In the latter part of 2004 and the early part of 2005, Terrie Henderson, who directs Carter BloodCare's human resources department, began receiving

---

[2]Carter BloodCare receives blood donations and provides blood components to hospitals and other medical centers. The donor collections department is responsible for drawing blood products from donors.

complaints from several managers about how appellant treated them and others. Ridley received similar complaints. For example, Wallis cried while complaining to Henderson about how appellant had treated her. Norman and Peggy Barlow also complained to Henderson. Norman and Barlow eventually resigned in 2005,[3] and two other managers transferred away from appellant, including Wallis, who transferred to Waco. Mike Perez, who took Wallis's position after she transferred, told Henderson that he was "very upset about how [appellant] behaved in the workplace." Appellant had led a meeting in which she and other managers had criticized Perez's job performance.

Henderson told Ridley about the unrest in appellant's department, and Ridley became concerned about employee turnover in the department. In 2005, Carter BloodCare assigned appellant to work only in the collection training department rather than the donor collections department. Appellant's title changed from director of donor collections to director of procedure development and training. The reassignment gave appellant fewer employees to manage and sometimes allowed her to work less hours per week, but Carter BloodCare did not reduce her salary. Ridley, who is older than appellant, assumed responsibilities related to the donor collections department. According to appellant, she tried to meet with Ridley about the reassignment, but he would not

---

[3]Appellant stated that Norman, who had been a good employee, resigned because she was offended by something that appellant had said at a business lunch. Appellant testified that she had nothing to do with Barlow's resignation.

do so, and he was "cold" toward her. Appellant did not complain in 2005 that the reassignment had occurred because of her age.

In approximately August 2005, appellant began reporting to Michelle Stefan, who was another senior director, and different employees reported to appellant. According to appellant, she and Stefan met with each other "infrequently" because of Stefan's "lack of effort." Parts of appellant's deposition indicate, however, that appellant and Stefan communicated regularly in August and September 2005 and that Stefan organized monthly lunch meetings.

Stefan conducted 360-degree reviews of her subordinates. During these reviews, employees who reported to or interacted with the reviewed employee submitted written comments about the reviewed employee's strengths and weaknesses. A document titled "Summary of 360-Degree Feedback for Leslie Burton – 2005," which was compiled by Stefan in 2006, reveals that some of Carter BloodCare's employees had positive things to say about appellant's 2005 performance, while others complained about her communication skills, flexibility, demeanor, tendency to shift blame, threatening behavior, lack of organization, and failure to create an "atmosphere of cohesiveness." One employee commented that appellant had "many capabilities which are tempered by her attitude . . . . She needs to work on exemplifying teamwork and an even temper[.]" Another employee, however, called appellant a "great leader who cares for each employee and shows it." Yet another commenter stated, "[Appellant] constantly does things to bring this department together as a team."

4

The document also stated that appellant would "need to continue to overcome the perceptions of staff/coworkers that she is unapproachable." Finally, the document stated,

> [Appellant] did receive some unfavorable scores and feedback from coworkers/peers on the 360-degree reviews. There is a perception held by some that she is difficult to work with and is not working on developing teamwork between departments. This is a perception that [appellant] will need to understand and recognize as she moves forward. [I]t will be critical for her to work on changing this perception and improving her communication and teambuilding skills.

Stefan and appellant discussed the negative comments that Stefan had received about appellant. Appellant believed that employees who had completed the survey "took it as an opportunity to document and say mean and gossipy and untrue things." Appellant promised to improve her performance.

High turnover for employees who worked under appellant's supervision continued after appellant's 2005 transfer; according to Henderson, between 2005 and 2008, several employees who reported to appellant transferred or resigned. In 2007, Henderson received a complaint about appellant from an employee in the collection training department; the employee called appellant "harsh," "confrontational," and "hostile."

In 2008, Carter BloodCare reassigned appellant to lead a newly created technical writing department, and Carter BloodCare assigned Sallie Tinney, who is approximately five years older than appellant, to lead the collection training

5

department.[4]  In the new department, appellant hired her own subordinates, as she had in the other departments that she had worked in; one of these new employees was Helen Serrano.  According to Stefan, appellant's age had no relation to the reassignment.

Appellant again had fewer employees to manage based on the transfer, but Carter BloodCare still did not reduce her pay.  Stefan "envisioned that, as a director over a newly created procedure development department, [appellant] would work in an area of her strength . . . .  In the newly created procedure development department, she would have fewer employees to manage and hopefully fewer employee complaints and less employee unrest."  Respondents to a 2008 360-degree survey said, however, that appellant was unprofessional; often spoke poorly of others; was moody, childish, and difficult to work with; and had "no grasp of consistency."[5]  Also, in January 2009, Serrano complained about how appellant was treating her.

---

[4]The technical writing department was designed to write policies for Carter BloodCare's other departments and implement revisions to Carter BloodCare's processes.

[5]The respondents also said positive things about appellant, including that she was knowledgeable about the blood banking industry, that she "seem[ed] to have a firm focus on what [was] best for Carter BloodCare," that her attitude was "always positive," that she was cheerful, that she was "quality minded," and that she had an "[a]bility to think outside the box."  Appellant opined in her deposition that Carter BloodCare's employees were not properly trained about how to complete the 360-degree reviews.  She said that she was mischaracterized by the reviews because employees who completed the survey had a "negative agenda."

In February 2009, Carter BloodCare hired EPS, a human resources consulting company, to investigate the complaints against appellant. According to Stefan, appellant had previously complained that Stefan made direct contact with appellant's staff, so hiring EPS "accommodated [appellant's] wish that [Stefan] refrain from personal direct contact." In a letter sent by EPS to Henderson, EPS stated that Susan Sorrells, a "Senior Consultant," would investigate the complaint on behalf of EPS. Sorrells considered herself to be an independent contractor of EPS.

Henderson and Stefan met with Sorrells and told her about Serrano's complaint and issues pertaining to appellant's interactions with Carter BloodCare's employees. Henderson allowed Sorrells to review appellant's and Serrano's personnel files. Sorrells, who is a nonpracticing attorney, interviewed many Carter BloodCare employees, including appellant, in a vacant room within the human resources department. Numerous employees made negative comments to Sorrells about various aspects of appellant's job performance. One employee told Sorrells that working with appellant was "like working in a bomb factory." Some employees called Sorrells after the interviews concluded to talk more about appellant.

According to appellant, she believed before her meeting with Sorrells that the meeting was to be part of a general employee survey about Carter BloodCare's strengths and weaknesses. But when the three-hour meeting occurred, Sorrells was, according to appellant, aggressive, unrelenting, and

7

insulting. Appellant described her meeting with Sorrells as an "interrogation" and said that she felt confined, restricted, and overwhelmed. Sorrells, however, believed that she had asked open-ended questions that appellant had difficulty answering because appellant did not want to "face what other people were saying about her."

After Sorrells completed her investigation, she presented a verbal report to Henderson, Stefan, Bob Grigsby (Carter BloodCare's chief operating officer), and Dr. Merlyn Sayers (the company's chief executive officer). According to Henderson and Grigsby, Sorrells's report indicated there had been substantial employee unrest focused around appellant's behavior in the workplace. Sorrells was not asked for her opinion about whether appellant should be fired, but after a meeting attended by Henderson, Stefan, Grigsby, and Dr. Sayers, Carter BloodCare terminated appellant's employment in March 2009, when she was in her late fifties. According to affidavits filed by Henderson, Stefan, Grigsby, and Dr. Sayers, their decision to discharge appellant had nothing to do with her age; rather, the decision was based on appellant's workplace behavior. From being fired until her deposition in January 2010, appellant was unable to find suitable employment in the blood banking industry.

Appellant filed a charge of discrimination against Carter BloodCare, alleging that the termination of her employment "was preceded by disparate treatment on the ground of age." Appellant then sued appellees. She alleged a false imprisonment claim against all appellees (based on the interview she had

8

with Sorrells); defamation, invasion of privacy,[6] and an age discrimination claim against only Carter BloodCare; and an intentional infliction of emotional distress claim against only EPS and Sorrells. Appellant asked for actual and punitive damages.

Carter BloodCare filed traditional and no-evidence motions for summary judgment against all of the claims appellant had asserted against it. EPS and Sorrells also jointly filed traditional and no-evidence motions for summary judgment on appellant's claims against them. Appellant responded to the motions. Carter BloodCare objected to appellant's responses on the ground that she had raised a breach of contract claim for the first time in them and had attached her own deposition testimony that was, in part, conclusory, without foundation, and based on hearsay. EPS and Sorrells filed a motion to strike parts of appellant's summary judgment evidence for similar reasons. Appellant responded to Carter BloodCare's objections and Sorrells and EPS's motion to strike. The trial court sustained all of appellees' evidentiary objections and granted appellees' motions for summary judgment. Appellant brought this appeal.

**Summary Judgment Standards**

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the

---

[6]As discussed below, appellant later relabeled her invasion of privacy claim as a breach of contract.

9

light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

When a party moves for both a traditional and a no-evidence summary judgment, we generally first review the trial court's summary judgment under no-evidence standards. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 526 (Tex. App.—Fort Worth 2009, pet. denied). "When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion. The appellate court must affirm the summary judgment if any one of the movant's theories has merit." *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995) (citations omitted).

In a traditional summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort*, 289 S.W.3d at 848. If

10

uncontroverted evidence is from an interested witness, it does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. Tex. R. Civ. P. 166a(c); *Morrison v. Christie*, 266 S.W.3d 89, 92 (Tex. App.—Fort Worth 2008, no pet.).

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## Age Discrimination

In her first issue, appellant argues that the trial court erred by granting summary judgment for Carter BloodCare on her age discrimination claim. In her pleading, appellant contended that she could prevail on her age discrimination

11

claim under the labor code because she was demoted twice while younger peers in similar circumstances were not, subjected to various work conditions while younger peers in similar circumstances were not, and fired when there was not a legitimate, nondiscriminatory reason for doing so. Carter BloodCare sought summary judgment on traditional and no-evidence grounds.

An employer commits an unlawful employment practice if, because of age, the employer discharges an individual or discriminates against an individual in connection with compensation or the terms, conditions, or privileges of employment. Tex. Labor Code Ann. § 21.051(1) (West 2006);[7] *Davis v. City of Grapevine*, 188 S.W.3d 748, 767 (Tex. App.—Fort Worth 2006, pet. denied). An unlawful employment practice is generally established when a plaintiff demonstrates that age "was a motivating factor for an employment practice, even if other factors also motivated the practice." Tex. Labor Code Ann. § 21.125(a) (West 2006). But in the "absence of other evidence of an unlawful employment practice, evidence of the employment of one person in place of another is not sufficient to establish an unlawful employment practice." *Id.* § 21.061 (West 2006).

_____

[7]In enacting section 21.051, the legislature intended to correlate state law with federal law in employment discrimination cases; thus, we may rely on federal law to interpret and apply section 21.051. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000); *Cox v. Waste Mgmt. of Tex., Inc.*, 300 S.W.3d 424, 432 (Tex. App.—Fort Worth 2009, pet. denied).

In discrimination cases that have not been fully tried on the merits and in which the plaintiff alleges that the employer's stated reason for an adverse action was a pretext for discrimination (as appellant has here), we apply the *McDonnell Douglas* burden-shifting scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 1824–25 (1973); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Hernandez v. Grey Wolf Drilling, L.P.*, 350 S.W.3d 281, 284 (Tex. App.—San Antonio 2011, no pet.); *Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 492 (Tex. App.—Amarillo 2009, pet. denied). As we explained in *Davis*,

> Under this framework, the plaintiff must first demonstrate a prima facie case of discrimination,[8] and if the plaintiff is successful, the burden of production shifts to the defendant employer to show a legitimate and non-discriminatory basis for the adverse employment decision. If the defendant employer demonstrates a non-discriminatory reason for its employment action, the plaintiff must show that the defendant's proffered reason is merely a pretext.

188 S.W.3d at 767 (citation omitted); *see Hernandez*, 350 S.W.3d at 284; *Ptomey*, 277 S.W.3d at 492–93; *see also Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (stating that the Fifth Circuit applies the *McDonnell Douglas* framework to age discrimination cases). A plaintiff may show pretext by showing that the employer's explanation for the employment action is unworthy of credence. *Ptomey*, 277 S.W.3d at 493 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981)).

---

[8]This burden is "not onerous." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001).

13

Carter BloodCare sought summary judgment on the basis that appellant had no evidence of a prima facie case of age discrimination. To prevail against Carter BloodCare's no-evidence motion, appellant was required to produce more than a scintilla of evidence that she is in the protected class (meaning that she is at least forty years old),[9] was discharged (or suffered another ultimate adverse employment action, such as a reduction in compensation),[10] was qualified for the position from which she was discharged, and was replaced by someone under forty, replaced by someone younger, or was otherwise discharged because of age. *See Hernandez*, 350 S.W.3d at 284; *Ptomey*, 277 S.W.3d at 492; *Davis*, 188 S.W.3d at 767. The establishment of such a prima facie case is a condition precedent to a pretext analysis. *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 741 (7th Cir. 2002).

We agree with appellant that she presented more than a scintilla of evidence that she was over 40 years old when she was discharged from a position that she had been qualified for. We must still determine, however, whether she presented more than a scintilla of evidence that she was replaced by someone under forty, replaced by someone younger, or was otherwise discharged because of age. Appellant did not present evidence that she was replaced by someone under forty or younger than she was, so she must show

---

[9]*See* Tex. Labor Code Ann. § 21.101 (West 2006).

[10]Appellant's briefing focuses on her termination as Carter BloodCare's adverse employment action.

14

that she was "otherwise discharged because of [her] age." *Davis*, 188 S.W.3d at 767. In an attempt to establish this fact, appellant relies on the following allegations: "age[-]biased statements were made" by her supervisors, and she was treated differently in "numerous aspects of . . . supervision" than her younger peers.

**Alleged ageist comments**

Ridley allegedly made the first age-biased statement upon which appellant relies. During her deposition, appellant testified that Ridley had made a comment "that it was the intent of Carter BloodCare to hire a younger management team because we were all getting older and we wouldn't be there for long." Appellant said that Ridley made this comment three to five times, but she conceded that the comment was made in reference to hiring decisions. Appellant also recognized that Ridley was not in her chain of command and had not been her boss for several years when Carter BloodCare fired her. Stefan allegedly made a second age-biased statement. Specifically, appellant testified that Stefan had made a comment, after forgetting something that she had planned to do, "that because she was over 40 she guessed she was getting too old."

For two reasons, Ridley's and Stefan's alleged comments are inadequate to show that appellant was discharged because of her age. First, Carter BloodCare objected in the trial court to the admissibility of the alleged comments, asserting that they were irrelevant and lacked foundation. While appellant relies

15

on Ridley's and Stefan's alleged statements, she has not expressly argued that the trial court abused its discretion by sustaining Carter BloodCare's objection and excluding them. "Where evidence has been held to be inadmissible and that holding has not been challenged on appeal, this court cannot consider the excluded evidence." *Frazier v. Yu*, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied); *Rhodes v. Interfirst Bank Fort Worth, N.A.*, 719 S.W.2d 263, 265 (Tex. App.—Fort Worth 1986, no writ).

Second, even if we were to consider the comments, they are insufficient to raise a fact issue concerning discrimination. In *Jackson*, the Fifth Circuit considered the effect of an alleged comment from an employer's chief operating officer that Jackson, who had brought an age discrimination claim, was an "old, gray-haired fart." 602 F.3d at 380. The Fifth Circuit decided that the statement had no probative value and explained that comments are evidence of discrimination only if they are

> 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue. . . . Comments that do not meet these criteria are considered "stray remarks," and standing alone, are insufficient to defeat summary judgment.

> While [the chief operating officer's] alleged comment meets the first and third criteria, Jackson has provided no evidence that the comment was proximate in time to his firing or related to the employment decision at issue. . . . The comment appears wholly unrelated to Jackson's termination, and Jackson has not presented any evidence to show otherwise.

*Id.* (footnotes and citations omitted); *see also Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400–01 (5th Cir. 2000) (holding that in a plaintiff's claim of discrimination based on his national origin, comments that he was a "Russian Yankee" and a "Russian Jew" were insufficient to defeat the employer's motion for summary judgment because the comments were not proximate in time to the plaintiff's failure to receive raises or promotions, and the comments were therefore "stray remarks"), *cert. denied*, 532 U.S. 937 (2001). Texas courts take the same approach regarding "stray remarks" as the Fifth Circuit. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) ("We have held that stray remarks are insufficient to establish discrimination and statements made remotely in time by someone not directly connected with termination decisions do not raise a fact issue about the reason for termination."); *Niu v. Revcor Molded Products Co.*, 206 S.W.3d 723, 729–30 (Tex. App.—Fort Worth 2006, no pet.) (holding that a comment made eight months before a termination decision was not proximate enough in time to be probative of discrimination).

In her deposition, appellant dated Ridley's alleged comment about intending to hire a younger management team as occurring "very early in [her] career." She admitted that Ridley was referring to hiring decisions in the context of filling open vacancies, and she said that he explained that he and other employees would "be retiring soon." Appellant admitted that Ridley was not in her chain of command when she was fired, and appellant did not present evidence showing that Ridley had any influence on Carter BloodCare's decision

to fire her. Thus, because of proximity of time, Ridley's apparent lack of authority over the decision to fire appellant, and the fact that Ridley's comment was focused on hiring and retiring rather than firing, we hold that Ridley's alleged comment is no evidence to support a prima facie case of discrimination. For similar reasons, we conclude that Stefan's comment, which was made, according to appellant, "at one point," had nothing to do with managing employees, and had nothing to do with appellant but was rather focused on Stefan *herself* feeling old, cannot raise a fact issue on discrimination.

**Alleged disparate treatment**

Appellant contends that there were "numerous instances of disparate treatment . . . , including an involuntary demotion and numerous aspects of . . . supervision . . . to which younger peers were not subject." Appellant said in her deposition that

- when she changed departments in 2005, she was being treated differently than "younger employees that had similar allegations and problems with the company," such as Debbie Liles, who had allegedly micromanaged, embarrassed, and disrespected an employee but was not demoted or terminated (although appellant did not know whether anyone complained to human resources or upper management about Liles's behavior);

- Henderson "had personnel problems" with a long-term employee and was not demoted, counseled, reprimanded, or placed in a smaller office, as appellant had been;

- Jacalyn Biersmith had "difficult" working relationships with her employees without consequences; and

18

- Norman had some "personnel issues" and "questionable behavior," and nothing happened to Norman "to [appellant's] knowledge."[11]

Appellant admitted, however, that she did not know for a fact that Henderson, Liles, Norman, or Biersmith were younger than she was. Appellant also testified that Stefan, among other alleged faults, could not relate to appellant because of appellant's age; isolated appellant from meetings while not isolating appellant's younger peers; did not diligently address criticism with appellant like she did with appellant's younger peers; denied equivalent space or administrative support that was provided to appellant's younger peers; and was more animated, friendly, and communicative with younger employees.

Carter BloodCare objected to the portions of appellant's deposition when she discussed the alleged lack of comparable discipline for younger employees (Liles, Henderson, Biersmith, and Norman). The objections asserted that appellant's testimony was without foundation, irrelevant, and speculative since she had no personal knowledge of the ages or birthdays of her peers and because appellant did not show that her own circumstances were sufficiently comparable to the younger employees' situations. The trial court sustained the objections, and appellant's original briefing did not challenge that decision.

---

[11]It seems that much of appellant's testimony concerning these events was based on second-hand information. Appellant admitted that her information about Liles was based on "office gossip" and that she had "heard" that Biersmith was a taskmaster.

19

Thus, we conclude that we cannot consider that evidence.[12]  *See Frazier*, 987 S.W.2d at 610.

But even if we were to consider the evidence, we would conclude that it fails to raise a genuine issue of material fact about whether appellant was discharged because of her age.  The following exchange occurred during appellant's deposition:

> Q. . . . [W]hen you say [Henderson's] younger than you, what do you base that on?
>
> A.  I have no basis of fact.
>
> . . . .
>
> Q.  Do you know for a fact [Biersmith's] younger than you?
>
> A.  Not for a fact.
>
> Q.  Okay.
>
> A.  Nor Debbie Liles, nor Brandye Norman.

Because appellant did not produce more than a scintilla of evidence that the employees whom she used for disparate treatment comparisons were actually younger than she was, much less significantly younger than she was, she cannot

---

[12]Although appellant attempted to raise a complaint about the trial court's evidentiary ruling in a postsubmission letter, we have held that a "reply brief may not be used to raise new complaints." *Penley v. Westbrook*, 146 S.W.3d 220, 227 (Tex. App.—Fort Worth 2004), *rev'd on other grounds*, 231 S.W.3d 389 (Tex. 2007); *see Dallas Cnty. v. Gonzales*, 183 S.W.3d 94, 104 (Tex. App.—Dallas 2006, pet. denied) (op. on reh'g) ("The Texas Rules of Appellate Procedure do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's briefs but not raised by the appellant's original brief.").

rely on the comparisons to show age-related discriminatory conduct. *See Acosta v. Gov't Emps. Credit Union*, 351 S.W.3d 637, 643–44 (Tex. App.—El Paso 2011, no pet.); *see also Hartis v. Mason & Hanger Corp.*, 7 S.W.3d 700, 705 (Tex. App.—Amarillo 1999, no pet.) ("[W]hen one attempts to establish a *prima facie* case of age discrimination under section 21.051 by comparing his treatment with that of a younger individual, the difference in age between the two must be significant.") (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S. Ct. 1307, 1310 (1996)).[13]

Appellant also relies on her alleged "involuntary demotion" in an attempt to prove disparate treatment. But as we have discussed above, appellant did not present nonexcluded evidence that she was transferred to different departments within Carter BloodCare while similarly situated and significantly younger employees were not.[14] Moreover, the evidence establishes that older employees assumed appellant's responsibilities once she was transferred from her old positions to new ones. Thus, we hold that appellant's transfers do not raise a genuine fact issue of age discrimination.

---

[13]Federal courts have likewise held that in a disparate treatment claim, the compared employee must be significantly younger than the plaintiff. *See, e.g.*, *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 619 (7th Cir. 2000) (holding that a seven-year difference was not significant).

[14]Appellant testified that when she was transferred in 2005, she was "being treated differently than younger employees that had similar allegations and problems with the company." Carter BloodCare objected to this evidence, and the trial court excluded it. Appellant states in her brief that her second transfer was "justified on the positive basis of urging her to take it."

Finally, in her brief, appellant argues, "There were also numerous instances of disparate treatment . . . including . . . numerous aspects of the supervision of [appellant] to which younger peers were not subject." In her statement of facts, appellant directs us to her deposition testimony, in which she stated that Stefan treated her differently than younger employees because unlike Stefan's interactions with those employees, Stefan allegedly refused to meet with appellant,[15] failed to respond promptly to her, excluded her from meetings, isolated her, did not celebrate her birthday, did not properly coach or train her, did not provide periodic performance evaluations, denied her administrative support, denied her a director's office and eventually placed her in a cubicle, and solicited false and negative comments about her. Again, however, the trial court sustained Carter BloodCare's objection to appellant's testimony about how Stefan had treated her as compared to younger peers, and since appellant has not expressly appealed that ruling, we cannot consider the evidence. *See Frazier*, 987 S.W.2d at 610. Moreover, as the Beaumont Court of Appeals recently explained in a case where a plaintiff attempted to use other employees' inappropriate conduct to prove disparate treatment for his own misconduct and therefore raise an inference of discrimination,

> "To prove discrimination based on disparate discipline, the disciplined and undisciplined employees' misconduct must be of

---

[15]Two of the employees that Stefan allegedly met with regularly are Liles and Norman. As explained above, appellant did not produce evidence that Liles and Norman are significantly younger than she is.

22

'comparable seriousness.'" Precise equivalence in culpability is not required, but a plaintiff must usually show that the misconduct for which he was discharged was nearly identical to the conduct engaged in by an employee whom the company retained.

*Flores v. City of Liberty*, 318 S.W.3d 551, 556 (Tex. App.—Beaumont 2010, no pet.) (citations omitted); *see Reyes*, 272 S.W.3d at 593–95 (applying the comparable seriousness/nearly identical disparate treatment standard); *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917–18 (Tex. 2005) (same); *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 376 (Tex. App.—Fort Worth 2006, no pet.) ("More favorable treatment of a person outside a protected class can be used to show discrimination only if the circumstances are nearly identical."). In other words, as the Fifth Circuit has explained,

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. . . . If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

23

*Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009) (citations and footnotes omitted).

Even if the evidence had been admitted to show that Stefan treated appellant differently than other employees who worked under Stefan's authority, we conclude, based on our review of appellant's deposition, that she did not present more than a scintilla of evidence to demonstrate that she was similarly situated to those other employees or was significantly older than them. For that reason as well, we conclude that appellant failed to raise a genuine issue of material fact about the fourth prima facie element of age discrimination: that she was discharged because of her age.

Because appellant has not directed us to more than a scintilla of admitted evidence that supports a prima facie case for age discrimination under chapter twenty-one of the labor code, we hold that the trial court did not err by granting Carter BloodCare's no-evidence motion for summary judgment against that claim. *See* Tex. R. Civ. P. 166a(i); *Hamilton*, 249 S.W.3d at 426. We overrule appellant's first issue.

**False Imprisonment**

In her second issue, appellant asserts that the trial court erred by granting appellees' motions for summary judgment on her false imprisonment claim. Each appellee moved for summary judgment on appellant's false imprisonment claim on traditional and no-evidence grounds.

**The requirement of a willful detention**

To defeat appellees' no-evidence summary judgment motions, appellant was required to produce more than a scintilla of evidence of a willful detention that was without consent and was without the authority of law. *Dangerfield v. Ormsby*, 264 S.W.3d 904, 909 (Tex. App.—Fort Worth 2008, no pet.); *see Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). "[L]iability for false imprisonment extends beyond those who willfully participate in detaining the complaining party to those who request or direct the detention." *Dangerfield*, 264 S.W.3d at 909–10; *see Rodriguez*, 92 S.W.3d at 507.

> The first element of false imprisonment, a willful detention,
>
> may be accomplished by violence, by threats, or by any other means that restrains a person from moving from one place to another. Where it is alleged that a detention is effected by a threat, the plaintiff must demonstrate that the threat was such as would inspire in the threatened person a just fear of injury to her person, reputation, or property.

*Johnson*, 891 S.W.2d at 645 (citation omitted); *see Rodriguez*, 92 S.W.3d at 511 ("[F]alse imprisonment is an intentional tort, requiring a willful detention by the defendant.").

In *Johnson*, Johnson, a store's manager, had failed to pay for a Christmas wreath when leaving the store. 891 S.W.2d at 643. When Johnson returned to work two days later, the store's director, Lewis Simmons, escorted her to an office and questioned her about the wreath; Johnson admitted to not paying for

the wreath, and Simmons called the store's district manager, Mike Seals. *Id.* Because Seals wanted to meet with Johnson later that day, Simmons asked her to stay at the store but suggested that she stay in the office or work on a volunteer project. *Id.* Johnson generally stayed in the office, although she left it twice while waiting for Seals to arrive. *Id.* When he did so, he and Simmons questioned Johnson further, which caused her to cry, and then Seals suspended Johnson for thirty days. *Id.* Johnson sued the store, Seals, and Simmons for false imprisonment under the theories that Simmons had detained her by sternly insisting that she stay put while waiting for Seals and that he had restricted her from entering areas of the store. *Id.* at 645. The supreme court concluded that Johnson had not been willfully detained, stating in part,

> Simmons' request that Johnson not work in one area of the workplace does not constitute false imprisonment. When an employer supervises its employees, it necessarily temporarily restricts the employees' freedom to move from place to place or in the direction that they wish to go. Without more, however, such a restriction is not a "willful detention." An employer has the right, subject to certain limited exceptions, to instruct its employees regarding the tasks that they are to perform during work hours. . . . In order to effectively manage its business, an employer must be able to suggest, and even insist, that its employees perform certain tasks in certain locations at certain times. As a matter of law, [the store] did not falsely imprison Johnson.

*Id.* at 645–46 (citations and footnotes omitted). The court distinguished cases in which threats had been made to an employee's person, reputation, or property. *See id.* at 645 n.4; *see also Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 870–72 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (concluding that the

evidence raised a fact issue on false imprisonment when a store's manager, who suspected the plaintiff of stealing, grabbed the plaintiff's arm, told him to "shut up" and to not leave, and called the police, which resulted in the plaintiff's trip to a police station); *Black v. Kroger Co.*, 527 S.W.2d 794, 796–97, 800–01 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ dism'd) (holding that a jury could reasonably find false imprisonment based on an inability to exercise free will to leave an interview room when the plaintiff was threatened with being taken to jail and with not seeing her daughter for a long time if she did not admit to stealing money); *Kroger Co. v. Warren*, 420 S.W.2d 218, 220–22 (Tex. Civ. App.—Houston [1st Dist.] 1967, no writ) (upholding the trial court's finding of false imprisonment when the plaintiff was told that she could not leave the room until she signed a statement and was physically restrained when she attempted to leave).

We have also had an occasion to hold, as a matter of law, that evidence did not support a false imprisonment claim. *See Safeway Stores, Inc. v. Amburn*, 388 S.W.2d 443, 447 (Tex. Civ. App.—Fort Worth 1965, no writ). Kenneth Amburn had been working at a Safeway Store when R.C. Newman, a district manager, led him to a secluded area at the back of the store to speak to an independent investigator, Bill Koch, about Amburn's alleged stealing. *Id.* at 444–45. Without telling Amburn that he had to remain in the area or using physical force to restrain him, Koch interviewed Amburn for thirty to forty minutes; Amburn had the physical ability to leave the area but did not attempt to do so or indicate a desire to do so. *Id.* at 445. Koch told Amburn that there was evidence to send

27

Amburn to a penitentiary and that "the salary in Huntsville for checkers was not very good." *Id.* Eventually, Amburn signed a document in which he admitted stealing money. *Id.* Amburn sued the store for false imprisonment, alleging that he was "overawed and intimidated, frightened to the extent of being incapable of exercising his will in removing himself, and thereby prevented from leaving said place in said store where he was thus held and willfully and maliciously detained . . . against his will." *Id.* at 445–46. We reversed the trial court's judgment in Amburn's favor and rendered judgment against him, stating,

> [T]his case raises the question of the limitations imposed upon an employer in discussing with an employee matters relevant to his employment. We think an employer is entitled to discuss with his employees all matters bearing upon the duties and purposes attendant to the employment . . . . We also think the employee is entitled to be forthwith confronted with such information and that the logical place for such a conference would be in the establishment where the employee is hired to work. It is possible, o[f] course, for such an interview to be held at an improper place and conducted in an improper manner. From a careful review of the record, however, we do not believe this to be the case as far as Amburn is concerned. The conference with Amburn was conducted in the regular place of business by one whose duty it was to investigate such matters. The area was sufficient to accommodate the presence of the persons involved. No threats or physical efforts were made to restrain Amburn. He was at all times free to leave. There was no impediment to restrain Amburn from removing from one place to another.
>
> We do not approve of the conduct of Koch. Such conduct, however, bears only upon the value of Amburn's confession . . . . It has nothing to do with whether he was falsely imprisoned. The confession . . . may have been made because Amburn feared that he would be sent to the penitentiary . . . . This fact may have rendered the confession . . . involuntary. It did not render Amburn's presence in the area of interrogation false imprisonment.

28

While employers should be admonished that their dealing with employees should always be reasonable and humane, we cannot adopt a rule which would constantly place an employee in jeopardy of a charge of false imprisonment. The interview with Amburn had a direct bearing upon his duties as an employee. He was compensated during the time that he was in the area. Under the circumstances, it cannot be said that his requested presence for purposes of interrogation constituted false imprisonment unless he was unlawfully detained. We accept at face value Amburn's testimony that he was scared. *It is not unlikely that any person being confronted with questions concerning his personal integrity would relish such an interview. This, however, is not the same as false imprisonment.*

. . . .

. . . The threat which is alleged to have resulted in false imprisonment must be calculated to detain the person. It must result in more than intimidation if one can, by ordinary means, relieve himself from any restraint or detention.

*Id.* at 446–47 (emphasis added); *see also Morales v. Lee*, 668 S.W.2d 867, 869 (Tex. App.—San Antonio 1984, no writ) (concluding that there was no evidence of false imprisonment although a defendant screamed at his employee in the defendant's office, told her not to leave, and told her that if she did leave, he would call the police).

A year before deciding *Amburn*, we decided, under distinct facts, that a jury could have justifiably found some evidence of false imprisonment. *See Skillern & Sons, Inc. v. Stewart*, 379 S.W.2d 687, 690 (Tex. Civ. App.—Fort Worth 1964, writ ref'd n.r.e.). Stewart had been working for a drug store when she was accused of stealing and was asked to go to a meeting. *Id.* at 688–89. The investigator told Stewart that she could not leave until she wrote a statement

29

that she had stolen money and merchandise, told her that she was going to the penitentiary, and physically restricted her from getting up from a table. *Id.* at 689–90.

**Application of law to facts**

Carter BloodCare hired EPS in February 2009 because, in part, the company was concerned that it had high employee turnover. EPS independently contracted with Sorrells, who, by the time of her deposition, had conducted seventy to eighty employee investigations. Sorrells met with Carter BloodCare's officials about a complaint made by Serrano, one of Carter BloodCare's technical writers, against appellant. The officials gave Sorrells several names of individuals who had previous issues with appellant, and the officials allowed Sorrells to review Serrano's and appellant's personnel files. Serrano told Sorrells that there was "abuse from [appellant]." Serrano also said that she wanted to find somewhere else to work in Carter BloodCare because she was "afraid of [appellant's] backlash." Sorrells also interviewed other employees, including Willis, who told Sorrells that appellant "had told the technical writers, [']I'll destroy anyone who challenges me.[']" Willis told Sorrells that Willis was scared because appellant's behavior was erratic.

Before appellant's meeting with Sorrells in an office at Carter BloodCare, appellant had recently used the same office to conduct an employee's performance review. Sorrells described the room where she interviewed appellant as a

vacant office. It's obvious that it's nobody's current office. It has a little bit of storage . . . either boxes or shelves. . . . [It has] a desk, two chairs. I recall that there's a phone. And I don't recall there being much else as far as supplies or anything of that nature . . . . [T]he office was very comfortable for two people.

At the beginning of the interview, Sorrells closed the door of the office where she and appellant sat. According to Sorrells, she did so to keep the conversation private. Appellant sat as close to the door as Sorrells did.

Sorrells introduced herself as a nonpracting attorney, told appellant that she was not recording the conversation, and ensured that appellant was also not doing so. Sorrells also told appellant that the interview would be "confidential to the extent possible" but that she would report the results of the interview to Carter BloodCare's officials. Sorrells warned appellant that she could be disciplined for discussing the interview with others.

Sorrells interviewed appellant for about three hours (she had met with Carter BloodCare's other employees from thirty minutes to two hours). During that time, appellant did not ask for a bathroom break. Sorrells never touched appellant or threatened to do so. But according to appellant, Sorrells's tone "became agitated and frustrated at certain points." Sorrells asked appellant about "numerous negative comments" that, according to Carter BloodCare's employees, appellant had made. According to Sorrells, appellant denied making some of the comments but admitted to "saying some things." Appellant testified in a deposition that Sorrells's "posture during most of the interrogation was leaning forward and asking . . . closed-ended, accusatory questions." Sorrells

31

denied conducting the interview with appellant in an aggressive manner and denied asking leading questions. Appellant said that Sorrells made her feel "dirty and worthless and unworthy and embarrassed and shamed and insulted." Appellant believed that she was to meet with Sorrells for an hour-long employee satisfaction survey, rather than, in appellant's words, a "three-hour bashing that left [her] totally degraded, ashamed, devastated, shocked, horrified, diminished, [and] feeling worthless." Appellant said that Sorrells's questioning was "unrelenting, repetitive, and shocking." She believed that Sorrells had asked insulting questions, had made insulting comments, and that Sorrells "had no regard for [appellant's] discomfort with the questions."

Although appellant stated that she did not believe that she had the authority to leave the interview with Sorrells because Sorrells was there at Carter BloodCare's senior management's direction, appellant admitted that she never asked or tried to leave. Appellant also conceded that she was not told that she was not free to leave the room.

Appellant said that she shared with Sorrells on more than one occasion that she was uncomfortable in the interview. She added, "I would not have willingly gone into that meeting so totally unprepared and surprised by the tone at that meeting." She said, "I object to the fact that I was so . . . humiliated, so insulted, . . . that I was literally cemented to my seat in shock and horror . . . at what was going on." Sorrells admitted that appellant expressed discomfort during the interview, and Sorrells stated that appellant seemed surprised by

32

some of the questions that Sorrells had asked. According to Sorrells, this was because appellant "was finding the questions difficult to answer, that it was difficult for her to face what other people were saying about her." Sorrells did not talk to appellant about favorable comments that had been made about her because she did not believe that appellant would dispute the favorable comments.

At the end of the interview, Sorrells asked appellant whether appellant had anything else to say, and appellant said that she did not. Sorrells told appellant that appellant should not discuss anything that had happened in the interview with anyone. Sorrells also gave appellant Sorrells's business card and asked appellant if there was anyone that appellant would like her to contact "to help [appellant's] case." Appellant said that she would "think about it and get back to her." Later, appellant sent Sorrells an e-mail to provide Sorrells with additional information; in that e-mail, appellant queried about whether she would have another meeting with Sorrells. Sorrells responded that there were no plans for a follow-up meeting.

Despite the undisputed evidence that appellant was not physically restrained, was not told that she had to stay in the interview, and never asked to leave it, she contends that there are several facts by which we may infer appellees' willful detention of her. First, appellant contends that Sorrells "referred to [appellant] as an accused individual, and consistent with doing so, admitted asking [appellant] repeatedly about pejorative comments about her." But the

33

record citation appellant gives for that contention does not establish that Sorrells referred to appellant as an accused individual at the time of the interview; instead, the record shows that during her deposition, Sorrells referred generally to issues related to accused individuals in her investigations. Appellant also contends in her brief that false imprisonment may be inferred from the fact that Sorrells knew of appellant's "psychological sensitivity" during the interview. In her deposition, Sorrells said that during the interview, appellant disclosed that she had visited a counselor about her prior transfer at Carter BloodCare. We disagree, however, with appellant's assertion that this disclosure should have "led to the immediate ending" of the interview. Like in *Amburn*, what other Carter BloodCare employees had said about appellant's workplace behavior, and how appellant responded to the employees' accusations, had a direct bearing upon appellant's employment, and Carter BloodCare was entitled to investigate those matters. *See* 388 S.W.2d at 446. Thus, we decline to infer false imprisonment simply from Sorrells's asking various difficult questions or from appellant's discomfort with the questions. *See id.* ("It is not unlikely that any person being confronted with questions concerning his personal integrity would relish such an interview. This, however, is not the same as false imprisonment."); *see also Morales*, 668 S.W.2d at 869.

Second, appellant contends that Sorrells admitted to misleading appellant about the purpose of the interview. We have found no such admission in the record references provided by appellant; instead, Sorrells testified that she told

34

appellant the truth about the purpose of the interview. Third, appellant argues that Sorrells "admitted to a different and decidedly more detailed form of preparation for the interrogation of [appellant] . . . and a much longer interrogation of [appellant] . . . than any interview of [appellant's] subordinates." We cannot agree that Sorrells's level of preparation for the interview with appellant raises an inference of Sorrells's intent to detain appellant. Nor do we believe that the comparative length of appellant's interview to Sorrells's other interviews creates a fact issue on false imprisonment; it makes sense that appellant's interview lasted longer because it involved questions generated by facts that Sorrells accumulated in many other interviews.

We also disagree with appellant's assertion that the facts of this case are "precisely consistent" with the facts of *Skillern* and *Black*. *See Black*, 527 S.W.2d at 800–01 (holding that there was evidence of false imprisonment when the plaintiff was told that if she did not admit to taking money, she would be handcuffed, taken to jail, and "would not see her daughter for a long time"); *Skillern*, 379 S.W.2d at 689 (holding that evidence supported false imprisonment when, according to the plaintiff, she was physically restrained and was told that she could not leave until she admitted stealing money and merchandise). Finally, we disagree that Sorrells's telling appellant that Sorrells would report the results of the interview to Carter BloodCare's management amounts to evidence of a willful detention. In most serious employment investigations, employees could reasonably feel compelled to defend themselves in an attempt to avoid the

35

prospect of an adverse employment action, but a false imprisonment claim is generally not available when someone remains in a location while attempting to establish innocence. *See Martinez v. Goodyear Tire & Rubber Co.*, 651 S.W.2d 18, 21 (Tex. App.—San Antonio 1983, no writ). Appellant testified that she stayed in the interview because she "felt compelled to . . . try to defend [her] character." She has given that same reason on appeal for staying in the interview.

Comparing the facts of this case, even when viewed in the light most favorable to appellant, to the circumstances in the cases cited above in which courts held that plaintiffs failed to raise fact issues on false imprisonment, we hold that appellant did not present more than a scintilla of evidence to defeat appellees' no-evidence motions for summary judgment on that claim. *See* Tex. R. Civ. P. 166a(i); *Hamilton*, 249 S.W.3d at 426. We therefore conclude that the trial court did not err by granting summary judgment for appellees on the claim, and we overrule appellant's second issue.

### Intentional Infliction of Emotional Distress

In her third issue, appellant contends that the trial court erred by granting summary judgment on her intentional infliction of emotion distress (IIED) claim, which she filed against only EPS and Sorrells. A claim for IIED requires the plaintiff to show intentional or reckless conduct that was extreme and outrageous and that caused the defendant severe emotional distress. *See Leachman v. Dretke*, 261 S.W.3d 297, 315 (Tex. App.—Fort Worth 2008, no pet.) (op. on

36

reh'g) (citing *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004)). "An employee may recover damages for intentional infliction of emotional distress in an employment context as long as the employee establishes the elements of the cause of action." *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999).

In the trial court, EPS and Sorrells sought summary judgment on appellant's IIED claim on the basis, in part, that appellant could not provide evidence of extreme and outrageous conduct. It is for courts to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery. *Id.* at 616. "Only when reasonable minds may differ is it for the jury to determine whether conduct has been sufficiently extreme and outrageous to result in liability." *Canchola*, 121 S.W.3d at 741.

Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Zeltwanger*, 144 S.W.3d at 445; *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). This "rigorous" legal standard helps "assure a meaningful delineation between inadvertence and intentionally or recklessly outrageous misconduct." *Twyman*, 855 S.W.2d at 622. Generally, "insensitive or even rude behavior does not constitute extreme and outrageous conduct. Similarly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise

37

to the level of extreme and outrageous conduct." *Bruce*, 998 S.W.2d at 612 (citation omitted); *see also Horton v. Montgomery Ward & Co., Inc.*, 827 S.W.2d 361, 369 (Tex. App.—San Antonio 1992, writ denied) ("There is no occasion for the law to intervene in every case where . . . feelings are hurt."). "In deciding whether particular conduct rises to an extreme and outrageous level, . . . courts should consider both the conduct's context and the parties' relationship." *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 610–11 (Tex. 2002). "[T]he fact that an action is intentional, malicious, or even criminal does not, standing alone, mean that it is extreme or outrageous for purposes of intentional infliction of emotional distress." *Brewerton v. Dalrymple*, 997 S.W.2d 212, 215 (Tex. 1999).

The Texas Supreme Court has recognized that to "properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees." *Bruce*, 998 S.W.2d at 612; *see Sears*, 84 S.W.3d at 610 ("It is simply not in the public's interest to dissuade employers from conducting internal investigations when employee-wrongdoing is suspected."). Thus, that court has held that a claim for intentional infliction of emotional distress does not lie for ordinary employment disputes, explaining,

> The range of behavior encompassed in "employment disputes" is broad, and includes at a minimum such things as criticism, lack of recognition, and low evaluations, which, although unpleasant and sometimes unfair, are ordinarily expected in the work environment. Thus, to establish a cause of action for intentional infliction of emotional distress in the workplace, an employee must prove the existence of some conduct that brings the dispute outside the scope

of an ordinary employment dispute and into the realm of extreme and outrageous conduct. Such extreme conduct exists only in the most unusual of circumstances.

*Bruce*, 998 S.W.2d at 613 (citations omitted).

In *Canchola*, an employee had accused Canchola, her boss, of sexual harassment. 121 S.W.3d at 738. Canchola's supervisor suspended him pending an investigation of the harassment charge, and the supervisor eventually fired Canchola. *Id.* Canchola sued his employer, claiming that the investigation of the harassment charge was extreme and outrageous because an employee had felt pressured into writing a statement against Canchola. *Id.* at 741. The Supreme Court disagreed, stating,

> It is neither extreme nor outrageous for an employer to ask an employee to share information concerning allegations made against a coworker, even if it is an unpleasant experience. An employer must be given some leeway in investigating serious accusations made against its employees. Wal-Mart's conduct in investigating and ultimately terminating Canchola was understandably unpleasant for him, but it was an "'ordinary employment dispute.'" Assuming that Canchola's allegations about the investigation were true, Wal-Mart's conduct was "within the bounds of its discretion to supervise, review, discipline, and ultimately terminate" its employees.

*Id.* at 741–42 (citations omitted); *see also Johnson*, 891 S.W.2d at 644 (rejecting an IIED claim because an employer acted within its legal rights in investigating reasonably credible allegations of an employee's misconduct); *Williams v. First Tenn. Nat'l Corp.*, 97 S.W.3d 798, 805 (Tex. App.—Dallas 2003, no pet.) (deciding that an employer's questioning of an employee about personal use of a company credit card in front of other employees was not extreme and outrageous

conduct); *Sebesta v. Kent Elecs. Corp.*, 886 S.W.2d 459, 463–64 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (refusing to assess liability although the employee was yelled at and made to undergo an "exit parade" during the busiest time of the day).

At trial and on appeal, appellant has contended that Sorrells's conduct during her interview of appellant, which was conducted under Carter BloodCare's direction as an attempt to investigate employee misconduct, was "plainly egregious" because (1) Sorrells "was aware of the peculiar economic susceptibility of [appellant] in threatening financial harm to her through loss of employment"; (2) Sorrells "learned in the course of the interrogation of . . . [appellant's] psychological susceptibility and used this to further undermine her equanimity"; and (3) Sorrells treated appellant as an accused individual, using "machine-gun rhetorical questioning [and] assuming the truth of ugly allegations" against appellant. Appellant asserts that none of this behavior "can be viewed as normal everyday conduct even by human resource consultants" such as Sorrells.

In her brief, appellant does not refer us to where the record discloses that Sorrells knew of appellant's particular economic susceptibility and threatened financial harm. Appellant could be referring to the part of her deposition in which she testified that during the interview, Sorrells informed her that she would be reporting the information that she gathered to Carter BloodCare's officials.[16]

---

[16]The Beaumont Court of Appeals has stated, "A threat to fire someone and ruin their career falls within the type of ordinary business dispute that is not

40

Sorrells's deposition establishes that she learned during her interview with appellant that appellant had sought counseling in relation to one of her transfers at Carter BloodCare, but the deposition does not establish that Sorrells proceeded with the interview differently based on that knowledge than she would have without it. Appellant testified in her deposition that she told Sorrells at least three times that she was uncomfortable with Sorrells's line of allegedly close-ended questioning, which was "edgy" and "very accusatory and negative . . . . It seemed that her questions were posed to imply wrongdoing and misconduct and misbehavior on my part." Appellant described Sorrells's demeanor as "aggressive and unrelenting," stated that Sorrells asked her "insulting questions" and made "insulting comments," and explained that the interview, which was "horrifying," devastating, and shocking,

> took almost an immediate turn in an attempt to intimidate me, to accuse me, to degrade me, to make me feel less than, to soil my reputation by repeating false allegations. I literally could not understand what was happening to me, the relevancy of these questions and why there was an outside consultant having me in a closed room, rapid fire, asking me accusatory close-ended questions, purposefully looking for an admission of misconduct on my part. I was shocked by it all.

Viewing these facts in the light most favorable to appellant, even if we were to assume that Sorrells's conduct in her one-time, three-hour interview of appellant was inappropriate and failed to meet typical professional standards, we

---

actionable as a claim for intentional infliction of emotional distress." *Louis v. Mobil Chem. Co.*, 254 S.W.3d 602, 609 (Tex. App.—Beaumont 2008, pet. denied).

hold that the facts are insufficient to raise a genuine issue of material fact on the rigorous, exacting standard of extreme or outrageous conduct. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 815, 818 (Tex. 2005) (indicating that IIED claims must typically be based on circumstances that border on "serious criminal acts"). Although Sorrells's interview was understandably unpleasant for appellant, the facts in this case resemble facts of cases in which courts precluded recovery for IIED. *See id.* at 817 (holding that there was no extreme and outrageous conduct, but only "callous" and "mean-spirited" conduct, when a company's chief executive officer refused to give a terminated employee a reference letter and allegedly orchestrated the employee's eviction from a house two months after the employee was terminated); *Tiller v. McLure*, 121 S.W.3d 709, 714 (Tex. 2003) (concluding that although the defendant acted inappropriately and callously toward a woman whose husband was dying with a brain tumor, causing the woman to cry, shake, and have insomnia, the defendant's conduct was not extreme and outrageous because the defendant never made physical threats and did not use vulgar or obscene language); *Brewerton*, 997 S.W.2d at 216 (holding that although a defendant made negative and allegedly retaliatory comments that were reflected in a professor's tenure file and repeatedly recommended that the professor should not be allowed to continue on a tenure track, this conduct was not extreme and outrageous). Likewise, the facts of this case are dissimilar to facts that have compelled courts to allow an IIED claim to proceed. *See Morgan v. Anthony*, 27 S.W.3d 928, 929–

30 (Tex. 2000); *Bruce*, 998 S.W.2d at 613 (holding that there was evidence of extreme and outrageous conduct when over a period of more than two years, a supervisor used harsh language and sexual innuendo, physically threatened employees and charged at them, screamed, and stared at them for as long as thirty minutes at a time); *see also Haynes & Boone, L.L.P. v. Chason*, 81 S.W.3d 307, 311–14 (Tex. App.—Tyler 2001, pet. denied) (comparing cases in which courts recognized the existence of extreme and outrageous conduct with cases in which courts refused to do so); *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 533 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (holding that a trial court erred by granting summary judgment against an IIED claim when the employee faced severe and continual sexual harassment over a three-month period).

Because we hold that appellant did not produce more than a scintilla of evidence of extreme and outrageous conduct under the exacting standard mandated by the supreme court, we hold that the trial court did not err by granting EPS and Sorrells's motion for summary judgment on her IIED claim, and we overrule her third issue.

**Breach of Contract**

In her fourth issue, appellant asserts that the trial court erred by granting summary judgment against her claim that Carter BloodCare breached a contract by disclosing her personnel file to Sorrells. In appellant's first amended original petition, which was her live pleading at the time of the trial court's judgment, she

43

stated, "For her third cause of action, Plaintiff would show that purportedly confidential information was disclosed by [Carter BloodCare] under circumstances in which such disclosure was not authorized." Carter BloodCare construed this statement as raising a claim about invasion of privacy on the public disclosure of private facts, and the company sought summary judgment on the basis that appellant could produce no evidence on that claim.[17] In responding to Carter BloodCare's motion for summary judgment, appellant stated that her complaint about the disclosure of her personnel file was based on breach of contract principles rather than invasion of privacy principles. Specifically, appellant contended that Carter BloodCare "agreed in its employment policies that personnel information . . . would not be provided to third parties." Carter BloodCare's employee handbook, which appellant received during her employment, states,

> The information contained in your personnel file is the confidential property of [Carter BloodCare]. Due to the confidential nature of personnel files, the Human Resource Department is responsible for controlling all access to personnel files.
>
> . . . Personnel files are not available for review by former employees, unauthorized employees or outside parties except where provided otherwise by law. Generally, only supervisors and management personnel of [Carter BloodCare] who have a legitimate reason to review information in a file are allowed to do so.

---

[17] *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473–74 (Tex. 1995) (listing the elements of the invasion of privacy tort).

44

The handbook, however, also states that it is "not an employment contract or contractual agreement."[18]

Carter BloodCare objected to appellant's attempt to "assert a claim which is outside [of] the live pleadings," and the company also objected to appellant's "apparent attempt to try this issue by consent." The trial court sustained this objection. Thus, because the trial court precluded appellant's attempt to expressly raise a breach of contract claim for the first time during the summary judgment proceedings and because appellant has not expressly appealed that decision, we will not consider the merits of the claim. *See Frazier*, 987 S.W.2d at 610. We overrule appellant's fourth issue.

### Defamation

In her fifth issue, appellant asserts that the trial court erred by granting summary judgment for Carter BloodCare on her defamation claim. In the trial court, appellant pled that employees of Carter BloodCare, acting within the scope of their employment, "made false defamatory statements to Sorrells." Through

---

[18]Appellant does not cite authority in the part of her brief relating to her breach of contract claim, nor does she state the elements of that claim. For this reason, in addition to the reason discussed below, we decline to consider the merits of the claim. *See* Tex. R. App. P. 38.1(i); *Gray v. Nash*, 259 S.W.3d 286, 294 (Tex. App.—Fort Worth 2008, pet. denied). We note that we have held that employee handbooks generally do not create contracts and that this is "particularly true if the handbook contains a disclaimer." *Brown v. Sabre, Inc.*, 173 S.W.3d 581, 585–86 (Tex. App.—Fort Worth 2005, no pet.); *see Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993) (stating that a disclaimer in an employee handbook negates any implication that personnel procedures create contractual relationships).

an interrogatory, Carter BloodCare asked appellant to identify each employee who had defamed her and to state the gist of the defamatory comment. Appellant replied that the employees who had defamed her included, but were not limited to, Ridley, Norman, Barlow, Serrano, Ronda Willis, and Melissa Court. Later, in a deposition, when asked who had defamed her, appellant responded that Court, DiAnna Richardson, Willis, Serrano, and Barlow had done so, and that she could not think of anyone else "at [that] time."

Carter BloodCare sought summary judgment on the bases that appellant had no evidence of her defamation claim, that the comments over which appellant sued were not defamatory as a matter of law, that the company had a qualified privilege regarding the comments, and that claims about some of the comments were barred by a statute of limitations. Appellant responded by stating that the communications supporting her defamation claim fell into categories of (1) statements by appellant's subordinates about appellant that were made in a 360-degree review, and (2) statements made during interviews with Sorrells and republished to senior management representatives of Carter BloodCare. Appellant has referred to these same categories on appeal.

For a private plaintiff (instead of a public official or public figure) to maintain a defamation claim, the plaintiff must show that the defendant, while acting with negligence, published a statement that was defamatory concerning the plaintiff. *Fox Entm't Group, Inc. v. Abdel-Hafiz*, 240 S.W.3d 524, 531 (Tex. App.—Fort Worth 2007, pet. denied) (op. on reh'g); *see AccuBanc Mortg. Corp. v.*

46

*Drummonds*, 938 S.W.2d 135, 147 (Tex. App.—Fort Worth 1996, writ denied) (explaining that statements are published when they are "communicated orally, in writing, or in print to some third person capable of understanding their defamatory import and in such a way that the third person did so understand"). A statement is defamatory when it tends to injure a person's reputation. *See San Antonio Express News v. Dracos*, 922 S.W.2d 242, 247 (Tex. App.—San Antonio 1996, no writ). Slander is a defamatory statement that is orally communicated or published to a third person without legal excuse. *Johnson*, 891 S.W.2d at 646. In suits brought by private individuals, truth is an affirmative defense to slander. *Id.* But a statement may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances. *See Ezrailson v. Rohrich*, 65 S.W.3d 373, 376 (Tex. App.—Beaumont 2001, no pet.). Also, a defamatory statement must be sufficiently factual to be susceptible of being proved objectively true or false, as contrasted from a purely subjective assertion. *Thomas-Smith v. Mackin*, 238 S.W.3d 503, 507 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

On appeal, appellant refers generally to more than forty pages of the record that she claims contain defamatory comments.[19] These pages, comprising deposition transcripts and Sorrells's handwritten notes from her

_____

[19]Appellant refers specifically to only one alleged comment that she proposes was defamatory; she states that someone accused her of "criminal conduct of stealing." We cannot locate in the record where anyone accused appellant of taking something with criminal purposes.

47

sixteen interviews of Carter BloodCare's employees, contain numerous statements concerning appellant, including, as a sample of the statements, that appellant had promoted herself; had created turmoil; had intimidated people; had pressured employees; had called someone a "twit"; had threatened someone; had treated someone unfairly; had made unflattering statements about a coworker's character; had told an employee, "If I ever hear you say anything, your life will not be worth a thin dime"; had violated standard operating procedures; had said that she would destroy anyone who challenged her; and had said that an employee was "full of shit." Appellant has not indicated whether she relies on all of these comments in her defamation claim or on only some of them. And in both her brief on appeal and in her brief in support of her response to Carter BloodCare's motion for summary judgment in the trial court, appellant failed to apply the defamation principles explained above to any of these statements or the other comments contained in the record pages that she has cited. Instead, in her brief on appeal, appellant contends only that the statements were collectively defamatory because they referred to her and were calculated to injure her and to impute dishonesty toward her.

An appellate brief must contain argument and the authorities and facts relied upon for the appeal. *Allegiance Hillview, L.P. v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 873 (Tex. App.—Fort Worth 2011, no pet.); *see* Tex. R. App. P. 38.1(i). An inadequately briefed issue may be waived on appeal. *Allegiance Hillview, L.P.*, 347 S.W.3d at 873 (overruling a party's issue about the trial court's

failure to grant the party's request for additional findings of fact and conclusions of law because the party did not "identify which requested but refused additional finding prevented it from properly presenting its appellate argument"); *Hall v. Stephenson*, 919 S.W.2d 454, 467 (Tex. App.—Fort Worth 1996, writ denied) (noting that we are not generally required to search the record to find support for a party's contentions); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing the "long-standing rule" that a point may be waived due to inadequate briefing). As the El Paso Court of Appeals has explained, it is an appellant's burden to discuss assertions of error, and "we have no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was error. Nor are we required to sift through the record in search of facts supporting a party's position." *Rubsamen v. Wackman*, 322 S.W.3d 745, 746 (Tex. App.—El Paso 2010, no pet.) (citation omitted).

We decline to search through appellant's globally cited forty pages of the record, unaided by a tailored argument by appellant, in an attempt to sort statements that may meet the criteria for defamation from comments that do not. *See id.*; *Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Tex. & Jurisdiction v. Jackson*, 732 S.W.2d 407, 412 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc) ("This court is not required to search the record for evidence supporting a litigant's position under particular points of error . . . ."). Because defamation is based on a statement and because appellant has not

49

directed us to a specific statement that was defamatory, we overrule her fifth issue as inadequately briefed.

## Conclusion

Having overruled each of appellant's issues, we affirm the trial court's judgment.


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT, J.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED:  January 5, 2012